710 A.2d 441

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. DAVID EISENMAN, DEFENDANT–APPELLANT.

Argued November 17, 1997—Decided May 14, 1998.

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney; *Ms. Brody* and *Barbara A. Hedeen,* Assistant Deputy Public Defender, on the briefs).

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

This appeal presents two issues for resolution. The first, whether defendant's criminal prosecution for absconding from parole is barred by principles of double jeopardy and fundamental fairness because of the Parole Board's prior revocation of his parole for substantially the same conduct, is virtually indistinguishable from the issue raised and resolved in *State v. Black,* 153 *N.J.* 438, 451–453, 455–456, 710 *A.2d* 428, 435–436, 437 (1998), also decided today. The second question is whether the trial court, which sentenced defendant on the same date for multiple auto thefts, properly ordered consecutive suspensions of driving privileges for each theft pursuant to *N.J.S.A.* 2C:20–2.1.

I

In September 1987, defendant received a five-year sentence for theft and burglary. Two and one-half months later, he received a five-year sentence for receiving stolen property. In November 1988, defendant was sentenced to a four-year custodial term for theft. Those sentences were ordered to run concurrently. Defendant was paroled in July 1990, but was returned to prison for committing a new offense while on supervised release. In February 1993, defendant was re-paroled on the condition that he remain at the Institute of Human Development, a nonprofit substance abuse treatment center in Atlantic County, for a minimum period of one year. Defendant left that facility without authorization on March 26, 1993, and thereafter had no contact with parole authorities until his arrest on May 12, 1993. On April 1, 1993, defendant was classified as an absconder and a parole warrant issued for his arrest. That warrant was executed on May 13, 1993, the day after defendant's arrest. In September 1993, the Parole Board issued a Notice of Decision revoking defendant's parole on the basis that he had absconded from supervision and had not stayed in drug counseling, and ordering him to serve nine

months in prison on the parole violation, retroactive to May 13, 1993.

In July 1994, defendant pleaded guilty to absconding from parole, *N.J.S.A.* 2C:29–5b, and admitted to several crimes committed both prior to his May 1993 arrest and subsequent to his re-release in February 1994. In April 1993, defendant stole a 1983 Chrysler van from a residential garage in Spring Lake, New Jersey. He explained that he walked up the driveway, entered the unlocked garage with the intent to steal a car, and discovered the unlocked van with the keys in the ignition. Defendant started the van, opened the garage bay door and drove away. The next month, defendant was driving the van through Fair Haven when a police officer attempted to pull him over for speeding. Defendant pulled over, exited the vehicle and fled. As he ran, defendant was checking parked cars in the hope of securing a getaway vehicle. After several minutes, he spotted a 1992 Isuzu Trooper in a residential driveway with the keys in the ignition. Defendant entered and started the vehicle and drove away. Defendant was driving the stolen Isuzu on May 12, 1993, when he was pulled over on the Garden State Parkway by a New Jersey State Trooper. Conducting a roadside search of the vehicle, the State Trooper discovered a marijuana pipe that was later determined to contain trace amounts of marijuana. Defendant admitted to the Trooper that the pipe belonged to him.

Defendant was re-released on February 24, 1994, after posting bail on the pending absconding charge. Approximately 15 days later, defendant walked up a driveway in Deal, New Jersey, and stole both a 1992 Mercedes Benz and a 1993 Jeep Cherokee, both of which had been left unlocked with the keys in the ignition. He took the Mercedes first, dropped it off at a nearby apartment complex, and then returned on foot and took the Jeep. On March 16, defendant drove the Jeep to the Monmouth County Courthouse for a court appearance. Defendant was arrested at the courthouse, where he relinquished the keys to both the Jeep and the Mercedes and informed the police of the location of both

vehicles. Police recovered both the Mercedes and the Jeep, but ski boots valued at $700 were missing from one of the vehicles.

Defendant was charged pursuant to three separate indictments with one count of third-degree absconding from parole, three counts of third-degree burglary, one count of second-degree auto theft, four counts of third-degree auto theft, three counts of third-degree receiving stolen property, and single counts of fourth-degree hindering apprehension, fourth-degree eluding, and third-degree attempted escape. Defendant pleaded guilty to absconding from parole, one count of third-degree burglary, two counts of third-degree auto theft, one count of second-degree auto theft, and a disorderly persons charge of possession of a controlled dangerous substance. The remaining charges were dismissed.

The court sentenced defendant on August 26, 1994, to custodial terms in accordance with the plea agreement. On the charge of third-degree absconding from parole, *N.J.S.A.* 2C:29–5b, the court imposed a sentence of five years in prison to be served concurrently with his other sentences. On the charge of second-degree theft of the Mercedes and Jeep, together valued in excess of $75,000, *N.J.S.A.* 2C:20–3a, the court imposed a seven-year term of incarceration and a ten-year driver's license suspension. On the charges of third-degree burglary at the garage in Spring Lake, *N.J.S.A.* 2C:18–2, and the third-degree thefts of the Chrysler van and the Isuzu Trooper, *N.J.S.A.* 2C:20–3a, the court imposed a four-year custodial term to run consecutively to the seven-year term for the theft of the Mercedes and the Jeep, and two ten-year driver's license suspensions. On the disorderly persons offense of possession of a controlled dangerous substance, *N.J.S.A.* 2C:35–10a(4), the court ordered a six-month custodial term and a six-month driver's license suspension. All of the driver's license suspensions were ordered to run consecutively, resulting in an aggregate license suspension of thirty years and six months. Defendant's aggregate custodial sentence was eleven years. In addition, defendant was ordered to pay a mandatory fine of $1000 on each of the three charges of auto theft, restitution for the

missing ski boots of $700, $300 in Violent Crimes Compensation Board assessments, $450 in Safe Neighborhood Service Fund assessments, a $750 Drug Enforcement Demand Reduction penalty, and a $50 laboratory fee for the testing on the marijuana pipe. The $1000 fine and ten-year suspension of driving privileges on each auto-theft conviction were imposed by the court pursuant to *N.J.S.A.* 2C:20–2.1a(3), which provides for those penalties for persons convicted of a third or subsequent auto-theft offense. Defendant's presentence report indicates that he had fifteen prior theft convictions, juvenile and adult, all of which involved motor vehicle theft.

The Appellate Division affirmed defendant's convictions and sentences in an unpublished *per curiam* opinion, with the exception of a remand for a hearing on the $700 restitution award, for correction of the Safe Neighborhood Service Fund assessment, and for correction of the judgments of conviction regarding the license suspensions to conform to the oral sentence. We granted defendant's petition for certification on the question whether defendant's prosecution for absconding from parole violated the constitutional protection against double jeopardy and principles of fundamental fairness, and the question whether *N.J.S.A.* 2C:20–2.1 authorizes consecutive driver's license suspensions when a defendant is sentenced on the same date for multiple auto thefts. 150 *N.J.* 29, 695 *A.*2d 671 (1997).

II

■ As explained fully in *Black, supra,* 153 *N.J.* at 443, 710 *A.*2d at 430, "[t]he Double Jeopardy Clause's prohibition against multiple punishments . . . is not generally implicated by penalties imposed in civil and administrative proceedings." In determining whether a civil or administrative sanction constitutes "punishment" for double jeopardy purposes, this Court has applied the standard articulated by the United States Supreme Court in *United States v. Halper,* 490 *U.S.* 435, 446–448, 109 *S.Ct.* 1892, 1900–02, 104 *L. Ed.*2d 487, 500–02 (1989). See *State v. Womack,*

145 *N.J.* 576, 583, 679 *A.*2d 606, *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 517, 136 *L. Ed.*2d 405 (1996); *Doe v. Poritz,* 142 *N.J.* 1, 46, 662 *A.*2d 367 (1995). In *Womack* we held that a sanction may be determined to be punitive, and thus implicate constitutional protections against double jeopardy, if either the law pursuant to which the sanction was imposed was intended by the legislature to impose punishment or the impact of the sanction is punitive. 145 *N.J.* at 583, 679 *A.*2d 606. We also explained that protection against double jeopardy under the New Jersey Constitution, art. I, ¶ 11, is at least coextensive with the protection afforded by the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution. *Id.* at 582, 679 *A.*2d 606.

After this Court heard oral argument in this appeal and in *State v. Black, supra,* the United States Supreme Court decided *Hudson v. United States,* 522 *U.S.* ——, 118 *S.Ct.* 488, 139 *L. Ed.*2d 450 (1997), in which a five-member majority of the Court largely disavowed the method of double jeopardy analysis used in *Halper. See Black, supra,* 153 *N.J.* at 444–447, 710 *A.*2d at 431–433. In *Hudson,* the majority

> rejected the rule that whether a sanction is subject to double jeopardy restraints depends on whether that sanction is "punitive," as opposed to "solely" remedial in nature, and reestablished the traditional rule that whether a sanction is subject to double jeopardy restraints depends on whether that sanction essentially constitutes a criminal penalty.
>
> [*Black, supra,* 153 *N.J.* at 445, 710 *A.*2d at 431 (citing *Hudson, supra,* 522 *U.S.* at ——, 118 *S.Ct.* at 493–94, 139 *L. Ed.*2d at 458–59).]

We explained in *Black* that

> [b]ecause we find that defendant's argument must fail under both federal and New Jersey double jeopardy jurisprudence as it existed prior to the Supreme Court's decision in *Hudson,* and because application of *Hudson* would only increase the burden on defendant, we need not address whether New Jersey's double jeopardy jurisprudence should be reevaluated in the wake of *Hudson.* Therefore, the inquiry sufficient for the disposition of this appeal remains whether the administrative sanction of parole revocation was intended by the legislature to impose punishment or is punitive in impact in accordance with prevailing federal and New Jersey precedent prior to *Hudson.*
>
> [*Id.* at 446, 710 *A.*2d at 432.]

That reasoning applies with equal force to this appeal. After a close examination of federal and New Jersey precedents, *id.* at

446–451, 710 A.2d at 432–435, we concluded that "parole revocation under the New Jersey Parole Act is remedial and rehabilitative in both its essential purpose and its essential effect," and that "it cannot be viewed as punishment triggering the protections against double jeopardy of the state and federal constitutions." *Id.* at 451, 710 A.2d at 435.

■ We distinguished the sanction of parole revocation from the crime of absconding from parole under *N.J.S.A.* 2C:29–5b, which we explained derives from the crime of escape and "is clearly intended to punish violators of that criminal code provision." *Id.* at 452, 710 A.2d at 436. We reemphasize that "[b]y its terms, absconding from parole is a purposive crime that applies only to certain parole violators," *ibid.,* and that "[t]he critical element of the absconding offense is the act of going into hiding or leaving the state for the purpose of avoiding parole supervision." *Id.* at 453, 710 A.2d at 436. "It is only the purposeful avoidance of parole supervision that the legislature determined to criminalize for the purposes of deterrence and retribution." *Id.* at 453–454, 710 A.2d at 436.

■ We note, however, although the issue was never raised by defense counsel at the plea hearing or on appeal, that the plea taken from defendant by the trial court was barely sufficient to establish a violation of *N.J.S.A.* 2C:29–5b. Unlike the defendant in *Black,* who relocated out-of-state at a location unknown to parole officials, *id.* at 441, 710 A.2d at 430, there is no evidence on this record that this defendant "[a]bandon[ed] a place of residence without the prior permission of or notice to the appropriate supervising authority," which under *N.J.S.A.* 2C:29–5b constitutes "prima facie evidence that the person intended to avoid such supervision."

With regard to absconding from parole, the following colloquy ensued at the plea hearing between the court and defendant:

Q. All right, the indictment charges on escape, March 26, 1993 you did commit the crime of escape by absconding from parole that was imposed three different times, September 25, [19]87 and December 4, [19]87 and November 18, [19]88. Tell me what happened?

[A.] I was released on parole to the Institute of Human Development Drug Program. I was there for about 31 days. I was on a furlough. I came back several hours late. They said they were going to dismiss me from that program and that they, I guess, notified my parole officer at which time I packed and left.

Q. You left. Did you ever contact your parole officer after that?

A. No, sir.

Q. How long were you supposed to be there?

A. They said a year.

Q. A year. And how long were you there?

A. Thirty-one days, approximately that.

Q. And then you had no contact with anybody in parole until you were picked up in May?

A. Correct.

Q. And that is when you were picked up on the Garden State Parkway?

A. Yes.

We are satisfied that defendant's answers to the court's questions were minimally sufficient to establish a factual basis from which the court could conclude that defendant purposefully avoided parole supervision after leaving the Institute of Human Development Drug Program.

▆▆▆ We also find that the imposition of both the criminal sanction of conviction for absconding from parole and the administrative sanction of parole revocation, which we concluded in *Black, supra*, were clearly differentiated in their "essential purpose, essential effect, and targeted conduct," was not fundamentally unfair. 153 *N.J.* at 454, 710 *A.*2d at 437. We thus decline "to apply the doctrine of fundamental fairness to prohibit what the constitutional protections against double jeopardy do not." *Ibid.* "There is no indication that either the Legislature in enacting *N.J.S.A.* 2C:29–5b, the State Parole Board in revoking defendant's parole, or the State in pursuing this prosecution, acted in a way that was unjust, arbitrary, or unduly oppressive." *Id.* at 455, 710 *A.*2d at 437.

## III

We next consider whether the Law Division erred in ordering that defendant's driver's license suspensions run consecutively. *N.J.S.A.* 2C:20–2.1, which governs the suspension of driving privileges for auto theft, provides in pertinent part that:

a. In addition to any other disposition authorized by law, a person convicted under the provisions of this chapter of theft or unlawful taking of a motor vehicle shall be subject:

(1) For the first offense, to a penalty of $500.00 and to the suspension or postponement of the person's license to operate a motor vehicle over the highways of this State for a period of one year.

(2) For a second offense, to a penalty of $750.00 and to the suspension or postponement of the person's license to operate a motor vehicle over the highways of this State for a period of two years.

(3) For a third or subsequent offense, to a penalty of $1,000.00, and to the suspension or postponement of the person's license to operate a motor vehicle over the highways of this State for 10 years.

b. The suspension or postponement of the person's license to operate a motor vehicle pursuant to subsection a. of this section shall commence on the day the sentence is imposed. In the case of any person who at the time of the imposition of sentence is less than 17 years of age, the period of the suspension of driving privileges authorized herein ... shall commence on the day the sentence is imposed and shall run for a period as fixed by the court of one year for a first offense, two years for a second offense or 10 years for a third offense calculated from the day after the day the person reaches the age of 17 years. If the driving privilege of any person is under revocation, suspension, or postponement for a violation of any provision of this Title or Title 39 of the Revised Statutes at the time of any conviction or adjudication of delinquency for a violation of any offense defined in this chapter or chapter 36 of this Title, the revocation, suspension or postponement period imposed herein shall commence as of the date of the termination of the existing revocation, suspension, or postponement.

*N.J.S.A.* 2C:20–2.1 was enacted as *L.* 1991, *c.* 83, § 1, as part of a package of four bills designed to increase penalties for motor vehicle theft. As part of the same bill, *N.J.S.A.* 2C:20–2.2 permitted a court to order a defendant to pay a fine equaling the fair market value of any car worth over $7,500.00 if that vehicle was not recovered. *N.J.S.A.* 2C:20–16, enacted as *L.* 1991, *c.* 80, § 1, created a new second-degree crime for maintaining a "chop shop." *N.J.S.A.* 2C:20–17, enacted as *L.* 1991, *c.* 81, § 1, established that an adult who knowingly uses a person 17 years of age or younger to steal a car commits a second-degree offense. Pursuant to

*N.J.S.A.* 2C:20–18, enacted as *L.* 1991, *c.* 82, § 1, a defendant convicted as the leader of an auto theft trafficking network is also guilty of a second-degree crime. The Legislature subsequently amended *N.J.S.A.* 2C:20–2.1 to make its terms applicable to the theft and unlawful taking of any motor vehicle, not just an automobile. *L.* 1993, *c.* 219, § 4.

That package of bills was enacted in response to an epidemic of auto thefts in New Jersey. See Richard S. Remington, *Car Theft Package Cleared by Senate,* Newark Star Ledger, March 5, 1991, at 20. At the time of the bills' passage, New Jersey had the third highest auto-theft rate in the nation. Emily J. Hornaday, *Tough Bills Zoom in on Auto Theft,* Trenton Times, April 3, 1991, at A1. The cities of Newark, Trenton, Irvington, East Orange, Camden, and Elizabeth were all listed on an FBI list of the ten cities with the highest auto-theft rates in the nation. *Ibid.*

Governor Florio released a statement emphasizing the retributive goal of the 1991 package of bills on auto theft:

Car thieves will now face stiffer penalties and tougher laws in New Jersey.... Today we're keeping a promise to another group of people: those who make a living stealing cars.... The promise is we will catch you and you will go to jail.

. . . .

That's what the people of New Jersey demand and deserve. Car theft and jail. Perfect together.

[Office of the Governor, *News Release* (April 2, 1991)(internal quotations omitted).]

Senator Raymond Lesniak, the bills' sponsor in the Senate, emphasized the deterrent goal of the legislation and specifically of the provisions on license suspension: "Sometimes the threat of losing a driver's license for a long time is enough to scare off young people from engaging in auto theft." Richard S. Remington, *Car Theft Package Cleared by Senate,* Newark Star Ledger, March 5, 1991, at 20.

In *State v. Rama,* 298 *N.J.Super.* 339, 341, 689 *A.2d* 776 (App.Div.1997), *aff'd o.b.,* 153 *N.J.* 162, 707 *A.2d* 999 (1998), the court held that the suspension of driving privileges pursuant to *N.J.S.A.* 2C:20–2.1 is mandatory upon a conviction for automobile

theft. No reported New Jersey cases have addressed the ques-
tion raised in this appeal with regard to the propriety of imposing
consecutive license suspensions for multiple auto thefts when the
sentencing for each offense takes place on the same day. Defen-
dant argues that the plain language of subsection b. of the statute
that the "suspension or postponement of the person's license to
operate a motor vehicle pursuant to subsection a. of this section
*shall commence on the day the sentence is imposed* " (emphasis
added), requires that each of his suspensions run concurrently
from the day of sentencing. The State responds that the graduat-
ed scale of penalties for repeat offenders in subsection a. reflects
the Legislature's clear intent to impose severe penalties for each
incident of theft, and to impose even harsher penalties on multiple
offenders such as defendant. Subsection b. also provides that
where a defendant is under 17 at the time of sentencing, the
suspension period will not begin until the day after the defendant's
seventeenth birthday, and also requires that a defendant with an
existing suspension will not begin serving the newly imposed
suspension until the earlier suspension has expired. Accordingly,
the State observes that under the plain language of the statute not
all suspensions are required to begin on the day that sentence is
imposed.

█ Because we find that the statute is subject to more than
one reasonable interpretation, we "look beyond its plain language
to determine the Legislature's intent." *State v. Bridges,* 131 *N.J.*
402, 407, 621 *A.*2d 1 (1993). The legislative history of *N.J.S.A.*
2C:20–2.1 clearly demonstrates the Legislature's intent to impose
harsh penalties for auto theft, as well as to impose particularly
severe punishment on career car thieves. Were we to accept
defendant's interpretation of the statute and thus prohibit courts
from imposing a consecutive license suspension for each incident
of auto theft, we would dilute the evident retributive and deterrent
goals of the Legislature.

We find distinguishable this Court's opinion in *State, in re T.B.,*
134 *N.J.* 382, 634 *A.*2d 473 (1993), relied on by defendant. In *T.B.,*

we construed *N.J.S.A.* 2C:35–16, which provides for mandatory forfeiture or postponement of driving privileges for convicted offenders under chapters 35 and 36 of the Code of Criminal Justice, enumerating crimes involving controlled dangerous substances and drug paraphernalia, respectively. That statute contains language similar to that of subsection b. of *N.J.S.A.* 2C:20–2.1. In relevant part, *N.J.S.A.* 2C:35–16 provides:

[E]very person convicted of or adjudicated delinquent for a violation of any offense defined in this chapter or chapter 36 of this title shall forthwith forfeit his right to operate a motor vehicle over the highways of this State for a period to be fixed by the court at not less than six months or more than two years which shall commence on the day the sentence is imposed. In the case of any person who at the time of the imposition of sentence is less than 17 years of age, the period of the suspension of driving privileges authorized herein ... shall commence on the day the sentence is imposed and shall run for a period as fixed by the court of not less than six months or more than two years after the day the person reaches the age of 17 years. If the driving privilege of any person is under revocation, suspension, or postponement for a violation of any provision of this title or Title 39 of the Revised Statutes at the time of any conviction or adjudication of delinquency for a violation of any offense defined in this chapter or chapter 36 of this title, the revocation, suspension, or postponement period imposed herein shall commence as of the date of termination of the existing revocation, suspension or postponement.

In determining whether that statute should be construed to preclude the imposition of consecutive suspensions of driving privileges on an offender being sentenced on the same date for multiple drug offenses, this Court in *T.B., supra,* 134 *N.J.* at 383, 634 *A.*2d 473, found that "[t]he arguments in favor of either outcome are evenly balanced." We then determined that

because sufficient flexibility exists in the range of the suspensions the court may impose, the concurrent suspension of driving privileges more closely reflects the Legislature's intent concerning this sanction and will best advance the efficient trial and disposition of multiple drug offenses.

[*Ibid.*]

The Court's predominant reasons for so interpreting *N.J.S.A.* 2C:35–16 were threefold. First, we noted that "[o]rdinarily, enhanced-penalty statutes ... apply to chronologically-sequential convictions and not to simultaneous convictions." *Id.* at 387, 634 *A.*2d 473 (citing *State v. Hawks,* 114 *N.J.* 359, 365, 554 *A.*2d 1330 (1989)). Second, we noted that because most drug offenses will result in only a probationary term, permitting consecutive license

suspensions would "escalate the importance of the license revocation for lesser offenders," whereas "the more serious offender receives a sentence of imprisonment and would not suffer the 'separate sting' of license revocation." *Ibid.* Third, we determined that concurrent suspensions would "better achieve[ ] the legislative goal of fair and certain punishment" underlying the Comprehensive Drug Reform Act of 1986. *Id.* at 388, 634 *A.*2d 473.

Much of the reasoning that supported our interpretation of *N.J.S.A.* 2C:35–16 in *T.B.* is not applicable to *N.J.S.A.* 2C:20–2.1, and consequently does not control the issue posed by this appeal. A significant distinction between the two statutes is that *N.J.S.A.* 2C:20–2.1a provides for *fixed* penalties and suspensions for the first, second, third and each subsequent *offense,* whereas *N.J.S.A.* 2C:35–16 provides a court more flexibility in sentencing by providing a range of suspension between six and twenty-four months for every person convicted of a drug offense. If the statutory arguments in favor of either permitting or precluding consecutive suspensions under *N.J.S.A.* 2C:35–16 were found by this Court in *T.B., supra,* 134 *N.J.* at 383, 634 *A.*2d 473, to be in equipoise, that significant distinction shifts the balance in favor of permitting consecutive suspensions under *N.J.S.A.* 2C:20–2.1. We concluded in *T.B.* that the range of suspension provided for in *N.J.S.A.* 2C:35–16 would "provide appropriate punishment and adequate deterrence." *Id.* at 388, 634 *A.*2d 473. In contrast, only by permitting consecutive suspensions will the court be able to impose the prescribed penalty for each "offense," as suggested by the language of *N.J.S.A.* 2C:20–2.1a.

We also explained in *T.B.* that in enacting the Comprehensive Drug Reform Act,

> [t]he Legislature sought "to provide for the strict punishment, deterrence and incapacitation of the most culpable and dangerous drug offenders, and to facilitate where feasible the rehabilitation of drug dependent persons so as ultimately to reduce the demand for illegal controlled dangerous substances and the incidence of drug-related crime."
>
> [*Id.* at 387–88, 634 *A.*2d 473 (quoting *N.J.S.A.* 2C:35–1.1c).]

In comparison, the legislative history, and particularly the public pronouncements of Governor Florio and Senator Lesniak, suggests that in enacting *N.J.S.A.* 2C:20–2.1 the Legislature sought to impose harsh penalties on auto thieves for the purpose of deterrence. The statute and the legislative history suggest no complementary goal of rehabilitation. In *Hawks, supra,* 114 *N.J.* at 365–66, 554 *A.*2d 1330, this Court explained that there is a fundamental difference between the goals of "purely deterrence-oriented statutes" and "the rehabilitative function of repeat-offender statutes." The Court, construing the mandatory extended-term provisions of the Graves Act, *N.J.S.A.* 2C:43–6c and *N.J.S.A.* 2C:44–3d, found that "the potency of its deterrent value lies precisely in the certainty of enhanced punishment." *Id.* at 366, 554 *A.*2d 1330. The Court thus explained that "[t]o allow a defendant to escape the statutorily-required higher penalty ... either because of strategic maneuvering by counsel or because of the vicissitudes of the court docket, would create for defendants a windfall not envisioned by the Legislature." *Id.* at 366–67, 554 *A.*2d 1330.

By providing in *N.J.S.A.* 2C:20–2.1 for fixed, graduated penalties for each subsequent auto-theft offense, the Legislature intended to deter auto thieves with the "certainty of enhanced punishment"—a goal that is not reflected to the same extent by the flexible range of suspension available to a sentencing court under *N.J.S.A.* 2C:35–16. In *State v. Bowser,* 272 *N.J.Super.* 582, 586–87, 640 *A.*2d 884 (1993), the Law Division explained that "purely deterrent-oriented statutes ... normally do not encourage rehabilitation and make it difficult to differentiate among offenders," and that "such statutes limit the discretionary aspect of punishment, recognized in *Hawks* as one of the most important aspects of criminal justice." That description clearly applies to *N.J.S.A.* 2C:20–2.1, and the deterrent-oriented purpose of that statute distinguishes this appeal from *T.B.*

Another distinction is that many drug offenders subject to suspension of driving privileges under *N.J.S.A.* 2C:35–16 are guilty of no more than a disorderly-persons offense or a third- or

fourth-degree offense in which a probationary term will be involved, whereas *N.J.S.A.* 2C:20–2.1 will impact only those guilty of second- or third-degree auto theft. Pursuant to *N.J.S.A.* 2C:44–1e, not even first-time offenders convicted of third-degree theft of a motor vehicle will receive a presumption of non-incarceration. Furthermore, *N.J.S.A.* 2C:44–1d singles out auto theft by making repeat auto thefts the only third-degree offenses subject to a presumption of imprisonment. As a result, the concern expressed by the Court in *T.B.* that a rule permitting consecutive license suspensions would be harsher on less severe offenders is not as persuasive in interpreting *N.J.S.A.* 2C:20–2.1. Additionally, the windfall to a career auto thief, such as defendant, of a rule that would preclude the imposition of consecutive suspensions when separate and distinct incidents of auto theft are sentenced on the same date "either because of strategic maneuvering by counsel or because of the vicissitudes of the court docket," *Hawks, supra,* 114 *N.J.* at 367, 554 *A.*2d 1330, would be quite significant under *N.J.S.A.* 2C:20–2.1, which provides for a ten-year suspension for a third or subsequent auto theft offense. The Legislature could not have intended to confer that benefit on repeat auto-theft offenders.

We hold that the discretionary determination whether driver's license suspensions for multiple auto thefts under *N.J.S.A.* 2C:20–2.1 are to be served concurrently or consecutively should be made by the sentencing court consistent with the principles set forth in *State v. Yarbough,* 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L. Ed.*2d 308 (1986), superseded by statute to the extent that it recommended an overall outer limit on the cumulation of consecutive sentences for multiple offenses. *N.J.S.A.* 2C:44–5a; Cannel, *New Jersey Criminal Code, Annotated,* comment 3 on *N.J.S.A.* 2C:44–5 (1997). Because defendant's thefts, first of the Chrysler van, then of the Isuzu Trooper, and finally of the Mercedes and the Jeep, clearly were independent crimes—committed at different times in separate places and affecting separate victims—the imposition of three

consecutive ten-year suspensions could constitute a proper exercise of the sentencing court's discretion. See *State v. Ghertler*, 114 *N.J.* 383, 390–394, 555 *A.*2d 553 (1989); *Yarbough, supra,* 100 *N.J.* at 644, 498 *A.*2d 1239. However, this Court also observed in *Yarbough* that "the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision...." *Id.* at 643, 498 *A.*2d 1239. The record before the Court reveals that the Law Division failed to articulate its reasons for imposing consecutive suspensions, instead simply summarizing the aggravating and mitigating factors on each judgment of conviction. We therefore remand this matter to the Law Division for reconsideration of the imposition of consecutive or concurrent license suspensions, and for a statement of the reasons underlying its determination.

## IV

We affirm defendant's convictions and remand to the Law Division for a statement of its reasons for imposing consecutive license suspensions. As modified, the judgment of the Appellate Division is affirmed.

*For modification and affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*–none.