**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1284-15T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JOSE L. NEGRETE, a/k/a
BOOM BAP,

      Defendant-Appellant.

_____

Submitted May 7, 2018 – Decided April 22, 2019

Before Judges Accurso, O'Connor and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 06-01-0121.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel; Alison S. Perrone, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Randolph E. Mershon, III, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

O'Connor, J.A.D.

In 2015, a jury convicted defendant Jose L. Negrete of first-degree murder, N.J.S.A. 2C:11-3(a)(2); first-degree attempted murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5:1; and first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-2. He was sentenced to life in prison for murder and to a consecutive twenty-year term for attempted murder. Defendant appeals from his convictions and sentence. We affirm.

I

Defendant was initially tried on these three and other charges in 2008, but the jury was unable to reach a verdict and a mistrial was declared. In 2009, a second jury found defendant guilty of murder, attempted murder, and conspiracy to commit murder, but acquitted him of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) and N.J.S.A. 2C:2-6, and third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) and N.J.S.A. 2C:2-6. Defendant was sentenced to life in prison for murder and a consecutive twenty-year term for attempted murder.

Defendant appealed and, because we discerned juror misconduct during the course of that trial, we reversed the convictions and sentence and remanded

the matter for further proceedings.  State v. Negrete, 432 N.J. Super. 23 (App. Div. 2013).  The Supreme Court denied certification.  State v. Negrete, 217 N.J. 294 (2014).  In 2015, defendant was tried a third time, resulting in the convictions and sentence noted above.

The pertinent evidence, predominately derived from the testimony of members of the Almighty Latin King and Queen Nation (Latin Kings), was as follows.  In 2004, defendant was the leader of the Latin Kings in the Trenton area.  Jonathan Rodriguez (Jonathan),[1] a member of the Latin Kings, testified that members of this gang were required to follow defendant's orders or they risked punishment in the form of physical violence.  Defendant decided who was to be punished and the form of punishment to be inflicted.

In 2004, there was an ongoing dispute between the members of the Latin Kings in Trenton and a rival gang, the Ñetas  On one particular evening in 2004, members from each gang gathered at a park in order to "fight out" their differences.  The anticipated fight between the two gangs did not materialize because the police arrived and the gang members dispersed.  However, because it is relevant to one of the issues on appeal, we note that, just before the

_____

[1]  Three witnesses share the surname Rodriguez; therefore, for clarity, we refer to these witnesses by their forenames.

planned confrontation, Jonathan saw defendant pass a revolver to another member of the Latin Kings.

Jonathan also testified that defendant suspected A.R.,[2] a new member of the Latin Kings, and J.D., a member of the Latin Queens, had been disloyal to the Latin Kings. Jonathan heard defendant say that A.R. was a "goner" and J.D. a "snitch." Later, defendant asked Jonathan to kill A.R., but he refused.

Fernando Maestro testified he was the leader of the Ñetas gang in Trenton in 2004. At that time, he was also romantically involved with J.D. At one point, Maestro and defendant met to negotiate an end to the hostilities between the Latin Kings and the Ñetas. Defendant proposed "taking care" of A.R. if Maestro agreed to "take care" of J.D. Maestro testified that, among gang members, the term "to take care of" means "to kill." Maestro refused to agree to those terms because he did not want to hurt J.D.

Maestro testified that, at a subsequent meeting between defendant and Maestro, defendant stated he would "give up" A.R. to Maestro if Maestro agreed to "take care of" him; Maestro consented to this arrangement. Later that day, members of the Ñetas gang beat, but did not kill, A.R. Maestro testified he did not want A.R. killed because A.R.'s brother was a member of

---

[2] We use initials to protect the identity of the victims and their families.

the Ñetas. That evening, defendant called Maestro and confronted him about why he did not "take care of" A.R. Defendant then stated he would "take care of" A.R. in his own way.

Roberto Rodriguez (Roberto), a member of the Latin Kings, testified defendant was troubled by the fact Maestro and J.D. were involved in a romantic relationship, and that defendant had ordered J.D. to "stop messing with" Maestro. On the day A.R. was beaten up by Ñetas gang members, defendant called a meeting of the local Latin Kings. Roberto testified that, at that meeting, Esmeraldo Rodriguez (Esmeraldo) ordered Roberto to "get" A.R. and to "hurt him." Roberto retorted he wanted to do the job alone, but defendant then ordered that Roberto be accompanied by other members of the Latin Kings, specifically, Esmeraldo, Joey Martinez and Rhadames Acosta. Roberto acquiesced because defendant was the leader.

Roberto stated that he, Martinez, Esmeraldo, and Acosta then drove to A.R.'s home. Roberto overheard Esmeraldo talk to defendant on a cellphone. Roberto heard defendant tell Esmeraldo to instruct Roberto to "take out" A.R. After the call, Esmeraldo instructed Roberto to "take out" A.R. Roberto and Esmeraldo then entered J.D.'s home and convinced A.R. to get into the car. While there, Roberto took a piece of ribbon from the house to use to strangle

A.R. At that time, A.R. was living in J.D.'s house; J.D. was present when A.R. left the premises.

Roberto testified that after A.R. was placed in the car, Martinez drove the car around while Roberto strangled A.R. with the ribbon. A.R. fell unconscious and Martinez stopped the car. After pulling him from the car, Martinez determined A.R. was not breathing. Esmeraldo, Martinez and Rhadames "stomped" on A.R.'s face to make sure he was dead and then threw his body in a dumpster. When they got back into the car, Esmeraldo called defendant and informed him "the job was done."

Remarkably, A.R. survived the attack, and was spotted by the police walking on the exit ramp of a nearby highway later that evening. The day after the attack, defendant informed Roberto that A.R. was still alive. Defendant also advised that J.D. had been killed, but defendant did not know who had killed her.

Acosta did not testify at trial but his testimony from the second trial was read to the jury. His testimony of significance was that, as the local leader of the Latin Kings, only defendant had the authority to order a person killed.

Esmeraldo's testimony from the second trial was also read to the jury. He testified he heard defendant order certain members of the Latin Kings to

slash J.D. across her face, due to her perceived infidelity to the Latin Kings. As for A.R., Esmeraldo's testimony about the attempted murder was materially consistent with Roberto's. Esmeraldo added that he spoke with defendant right after what he believed was the successful murder of A.R. During that conversation, defendant learned J.D. was present when A.R. got into the car with Martinez, Roberto, Esmeraldo and Acosta, to which defendant responded, "We can't have nobody snitching on us."

Joey Martinez's testimony from the second trial was read to the jury. His testimony about A.R.'s attempted murder was essentially consistent with Esmeraldo's, Roberto's, and Acosta's. Martinez added that after A.R.'s body was thrown in the dumpster, Martinez and Esmeraldo met with defendant, who asked, "Did everything go right with [A.R.], was it done?" Esmeraldo replied in the affirmative. Later that evening, Martinez met with defendant, Josue Maldonado, George Gomez, Angel Hernandez, and Maurice Young. At that time, defendant ordered them to kill J.D., and Hernandez and Maldonado were provided with guns.

Martinez, Hernandez, Maldonado, Young, and Gomez then went to J.D.'s house. Young, Hernandez, and Maldonado entered her home and, approximately ten minutes later, Maldonado came out and told Gomez the gun

7

did not work. Gomez "messed with [the gun] a little," and handed it back to Maldonado, telling him the gun was working. Maldonado went back inside with the gun and, a few minutes later, the three men emerged from J.D.'s house and the five men then left the area.

## II

On appeal, defendant asserts the following points for our consideration:

POINT I: THE COURT'S DECISION TO ADMIT THE PRIOR TRIAL TESTIMONY OF ESMERALDO RODRIGUEZ AND JOEY MARTINEZ WITHOUT FIRST ORDERING THESE WITNESSES TO TESTIFY VIOLATED DEFENDANT'S RIGHT TO CONFRONTATION. (NOT RAISED BELOW).

POINT II: DEFENDANT'S RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE TRIAL COURT ADMITTED THE PRIOR TRIAL TESTIMONY OF ESMERALDO RODRIGUEZ WITHOUT REQUIRING THIS WITNESS TO APPEAR IN FRONT OF THE JURY. (NOT RAISED BELOW).

POINT III: THE ADMISSION OF TESTIMONY INDICATING THAT THE DEFENDANT HAD POSSESSED A GUN, AFTER DEFENDANT HAD BEEN ACQUITTED OF POSSESSING A GUN IN THIS CASE, REQUIRED A MISTRIAL BECAUSE THE PREJUDICE TO THE DEFENDANT COULD NOT BE UNDONE BY A CURATIVE INSTRUCTION, PARTICULARLY SINCE THE CURATIVE INSTRUCTION WAS INADEQUATE.

POINT IV:  THE TRIAL COURT ABUSED ITS
DISCRETION IN SENTENCING DEFENDANT TO
A LIFE TERM WITH AN 85% PERIOD OF PAROLE
INELIGIBILITY AND A TWENTY-YEAR TERM
WITH AN 85% PERIOD OF PAROLE
INELIGIBILITY BECAUSE A PROPER ANAYLSIS
OF THE AGGRAVATING FACTORS DOES NOT
SUPPORT SUCH A SENTENCE.

POINT V:  UNDER STATE V. YARBOUGH, THE
DEFENDANT SHOULD NOT HAVE RECEIVED
FOUR CONSECUTIVE SENTENCES.

A

We turn first to the contention the court erred when it permitted Joey Martinez's testimony from the second trial to be read to the jury. Some background is in order. Before his testimony from the second trial was read into the record, the State called Martinez as a witness, who briefly testified in the presence of the jury. He stated he was a member of the Latin Kings in 2004, and that he pled guilty to conspiracy to commit murder in this matter, for which he received a twelve-year sentence. He recalled testifying in a "previous proceeding" but, because of the passage of time, did not remember "much about the situation."

The prosecutor showed Martinez a page from the transcript of the second trial and inquired whether it refreshed his recollection. Martinez replied, "I

don't remember any of this, Sir." When asked if he remembered giving "any of this prior testimony," Martinez stated, "I don't remember any of that."

The prosecutor requested and was granted a 104 hearing, see N.J.R.E. 104(a), and the jury was excused. Before the hearing started, the prosecutor argued Martinez's assertion he could not recall the events surrounding defendant's conviction was insincere, a contention the State wished "to clarify" during the 104 hearing. The prosecutor requested that Martinez's testimony from the second trial be read to the jury in the event he continued to "feign recollection to the point where he becomes an absent witness or at least a witness that does not answer questions as directed by the court."

At the outset of his testimony at the 104 hearing, Martinez acknowledged testifying at the second trial, and even commented his testimony at that trial was truthful because he never commits perjury. Most of the hearing was comprised of the prosecutor showing Martinez certain questions he had asked Martinez during the second trial, and inquiring whether Martinez recalled such questions and the specific responses he provided. Martinez was unable to recall any specific question posed or the particular answer he gave to any particular question.

A-1284-15T4

It is not clear how Martinez's inability to recall a specific question and answer was probative, given Martinez's recollection of the subject matter of his prior testimony was what was relevant. In any event, when pressed by defense counsel whether Martinez met with the prosecutor to prepare for testifying at trial, Martinez stated he did not meet with the prosecutor because:

> [I]t was a long time ago, I don't remember. I don't want to waste my time or the State's time . . . .
>
> [I]t was a long time ago, you know, through everything that happened while I was in prison and everything like that. I just blocked it out, it's my past. I don't remember[.] I'm not going to sit here and say that I remember things that I don't. I don't remember.

At the conclusion of the 104 hearing, the State requested Martinez's testimony from the second trial be read to the jury, on the ground it was prior testimony and Martinez was an unavailable witness. Defendant opposed the admission of such testimony, arguing to do so would violate his rights under the Confrontation Clause of both the federal and state constitutions, see U.S. CONST. amend. VI, N.J. Const. art. I, ¶ 10, because he would be precluded from cross-examining Martinez. Defendant conceded Martinez was cross-examined by his previous attorney during the second trial.

The trial court initially found Martinez did not have a recollection of the subject matter of his prior testimony and, therefore, was an unavailable witness

11

pursuant to N.J.R.E. 804(a)(3). This Rule provides that a witness is "unavailable" if he "testifies to a lack of memory of the subject matter of the statement." N.J.R.E. 804(b)(1)(A) states, in pertinent part, that if a declarant is unavailable, the testimony he gave at a prior trial is not hearsay and is admissible if the party against whom the testimony was offered had the opportunity and a similar motive in the prior trial to cross-examine the witness.

Despite finding Martinez was unable to recall the subject matter of his prior testimony, the court then determined it implausible Martinez could not recall the facts of this case, and concluded Martinez feigned his lack of recollection. However, the court did not change its prior ruling that Martinez was unavailable as a witness pursuant to N.J.R.E. 804(a)(3).

After issuing its ruling, the trial court stated Martinez would be recalled to the witness stand after the jury returned to the courtroom, so that the State could conclude its direct examination or, if it had no questions, defendant could cross-examine Martinez. Defendant objected to that procedure, arguing there was no point in cross-examining Martinez, given the court had ruled he was unavailable as a witness and that his prior testimony would be read to the jury.

12

The court reiterated defendant had the right to cross-examine the witness at that time. Defendant declined and requested the witness not be recalled to the stand. Ultimately, both parties agreed that Martinez would not be recalled. When the jury returned to the court room, the court advised it the State had withdrawn Martinez as a witness and the jury was not to consider any of the testimony he had provided to that point. Martinez's prior testimony was subsequently read to the jury.

As stated, the court found defendant an unavailable witness pursuant to N.J.R.E. 804(a)(3). On appeal, defendant does not expressly challenge the court's finding Martinez was unavailable pursuant to the latter subsection, but does so implicitly. He argues Martinez's feigned loss of memory was tantamount to refusing to testify, triggering the application of N.J.R.E. 804(a)(2). The latter subsection provides that a declarant is unavailable if he "persists in refusing to testify concerning the subject matter of the statement despite an order of the court to do so[.]" Ibid. Defendant maintains the court should have ordered Martinez to testify pursuant to N.J.R.E. 804(a)(2) and found him unavailable as a witness only if he still refused to testify. Because the court did not follow the strictures of N.J.R.E. 804(a)(2), it is defendant's

position the admission of Martinez's prior testimony violated his rights under the Confrontation Clause.

Defendant does not dispute the conditions of N.J.R.E. 804(b)(1)(A) were met. As stated, this subsection states that testimony in a prior trial is not excluded by the hearsay rule if the declarant is unavailable as a witness, and the party against whom the testimony is offered had an opportunity and similar motive in the prior trial to develop the testimony by examination or cross-examination.

The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee that the accused in a criminal case has the right to confront the witnesses against him. The right to confrontation applies to out-of-court statements that are "testimonial." There is no question prior trial testimony is testimonial. Crawford v. Washington, 541 U.S. 36, 68 (2004).

In Crawford, the United States Supreme Court held the admission of out-of-court testimonial statements is unconstitutional, "unless the person who made the statement is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine that person." State ex rel. J.A., 195 N.J. 324, 328 (2008) (emphasis supplied). "Our decisions have followed [the

Crawford] analysis in confrontation cases arising post-Crawford." State v. Roach, 219 N.J. 58, 74 (2014).

As stated, in relevant part N.J.R.E. 804(a)(3) provides:

> (a) [A] declarant is "unavailable" as a witness if declarant:
>
> . . . .
>
> (3) testifies to a lack of memory of the subject matter of the statement[.]

The "statement" at issue is Martinez's testimony from the second trial.

"We interpret an evidence rule, as we would a statute, by first looking at its plain language." J.A., 195 at 338 (citing United States v. Am. Tel. & Tel. Co., 498 F.Supp. 353, 356-58 (D.D.C. 1980)). We give "the terms used . . . their ordinary and accepted meaning." State v. Shelley, 205 N.J. 320, 323 (2011). Here, the language in N.J.R.E. 804(a)(3) is clear on its face and we need not look any further to ascertain its meaning. This provision states that if a declarant testifies to a lack of memory of the subject matter of the statement, he is an unavailable witness.

Although the trial court in this matter opted to do so, N.J.R.E. 804(a)(3) does not require a court to make a factual determination whether a witness in fact recalls his prior statement or testimony. The subject language does not

15

state or imply in any way that the veracity of a declarant's claim he lacks memory of the subject matter of a statement must be established as genuine before he can be deemed unavailable as a witness. Further, defendant did not cite and we were unable to find any authority for such a premise.

Therefore, we reject the contention Martinez's feigned memory loss implicated and compelled the court to utilize N.J.R.E. 804(a)(2) when determining if Martinez was an unavailable witness. There was no violation of the Confrontation Clause because, before the prior testimony was admitted, the trial court properly determined Martinez was an unavailable witness pursuant to N.J.R.E. 804(a)(3), and it is not disputed defendant had an opportunity to cross-examine Martinez when he testified at the second trial. See N.J.R.E. 804(b)(1)(A); J.A., 195 N.J. at 328 (2008).

B

During trial, the prosecutor advised the court that "[w]e were hopeful that [Esmeraldo] would testify but apparently he will not testify, at least that's what he says at this point." The prosecutor subsequently clarified that Esmeraldo did not "unequivocally" say he would not testify and, in fact, stated he would testify to what he remembered.

In any event, the prosecutor requested a 104 hearing to determine Esmeraldo's availability pursuant to N.J.R.E. 804(a). The State did not call Esmeraldo as a witness before the jury, merely as a witness at the 104 hearing. During that hearing, Esmeraldo stated he did not remember what happened to either J.D. or to A.R., and did not recall ever having a conversation with defendant about A.R. Esmeraldo did not dispute he was convicted of attempted murder, but he did not remember pleading guilty to this crime or why he was even charged and convicted of this particular offense.

At the conclusion of the hearing, the State requested that Esmeraldo's prior testimony be admitted "under 804 . . . as unavailable." The court did not refer to any specific provision in N.J.R.E. 804(a), but it is implicit the court determined Esmeraldo was an unavailable witness pursuant to N.J.R.E. 804(a)(3). The court stated Esmeraldo was "unavailable simply because he's testified that he has no recall." However, the court did add that "his lack of memory was invented for purposes of this hearing." Defendant did not question Esmeraldo at the hearing or call him as a witness at trial.

As he did with respect to the admission of Martinez's prior testimony, on appeal defendant argues the court should have evaluated Esmeraldo's unavailability as a witness through the lens of N.J.R.E. 804(a)(2), not N.J.R.E.

804(a)(3). For the reasons we rejected such argument when considering whether the court erred by finding Martinez unavailable pursuant to N.J.R.E. 804(a)(3), we similarly conclude the court did not err when it found Esmeraldo unavailable for the same reason. Esmeraldo testified to a lack of memory concerning the subject matter of his prior statement. Therefore, he was an unavailable witness pursuant to N.J.R.E. 804(a)(3). Whether Esmeraldo could in fact recall the subject events is irrelevant for the purpose of determining his unavailability as a witness under N.J.R.E. 804(a)(3). Esmeraldo's prior testimony was not excluded by the hearsay rule because it met the conditions set forth in N.J.R.E. 804(b)(1)(A).

For the first time on appeal, defendant contends the trial court erred because it, as opposed to the jury, determined Esmeraldo was feigning memory loss. Defendant argues the jury should have decided whether this witness's memory loss was genuine. We reject this argument as wholly without merit.

First, the court, not the jury, determines the admissibility of evidence. See N.J.R.E. 104(a). The court determines whether a witness is unavailable pursuant to N.J.S.A. 804(a). Second, as previously discussed, the language in N.J.R.E. 804(a)(3) does not mandate that a court, let alone a jury, make a factual determination whether a witness's claim he lacks memory of the subject

18

matter of a statement is valid. The fact the trial court did so in this instance is beside the point. The cases defendant cites in his brief are inapposite and thus do not support his position. Further discussion on this particular contention is not warranted. R. 2:11-3(e)(2).

C

As previously noted, there was testimony that, just before members of the Latin Kings and Ñetas arrived at the park for the planned confrontation, defendant gave a revolver to a member of the Latin Kings. Immediately after that testimony was rendered, defendant objected and moved for a mistrial. Defendant argued the testimony was prejudicial in light of the fact that, at the conclusion of the second trial, he had been acquitted of possession of a weapon for an unlawful purpose and unlawful possession of a handgun.[3] Defendant stated he had "no objection to at least a qualified objection referencing the guns that were used to kill [J.D][,]" but objected to any reference defendant possessed guns. The court denied the motion and immediately gave the jury the following instruction:

---

[3] The indictment alleged defendant possessed handguns for the purpose of unlawfully using them against J.D., and that he was in unlawful possession of those weapons because he did not have a permit.

A-1284-15T4

> Ladies and gentlemen, just to be clear, Mr. Negrete is not charged with any weapons related offenses. So any testimony that you hear during the course of this trial if there's any to be heard, I don't know what's going to be said, okay, with regards to anybody – with regards to any weapons, their use, their possession, none of it should be considered with regards to Mr. Negrete at least when you're determining whether or not – what your verdict should be with regards to the conspiracy, attempted murder and the murder charge. He's not charged with weapons offenses. Any references to weapons are not to be considered to him. And you have to follow that instruction from now until the end of this trial and even during your deliberations.

On appeal, defendant argues evidence of an offense for which a defendant has been acquitted cannot be admitted at trial and, if it is, the only remedy is to declare a mistrial. At the least, he contends, the testimony referencing the revolver, which he claims tainted the jury against him, should have been stricken. If not stricken, he claims the instruction to the jury should have explained the evidence was admissible for only a specific purpose. Finally, he contends N.J.R.E. 404(b) precluded the admission of the subject testimony.

We address the denial of defendant's motion for a mistrial. "The grant of a mistrial is an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397,

20

(2011) (quoting <u>State v. Harvey</u>, 151 N.J. 117, 205 (1997)). Thus, an appellate court should not reverse a denial of a mistrial motion without a clear showing of actual harm or abuse of discretion. <u>Ibid.</u> (citing <u>State v. Labrutto</u>, 114 N.J. 187, 207 (1989)). In particular, "when inadmissible evidence erroneously comes before the jury, an appellate court should not order a new trial unless the error was clearly capable of producing an unjust result." <u>Ibid.</u> (citing <u>R.</u> 2:10-2; <u>State v. Frisby</u>, 174 N.J. 583, 591 (2002)) (internal quotation marks omitted).

Here, we reject the contention the trial court erred when it denied defendant's motion for a mistrial, or otherwise permitted the admission of this evidence. Even if the admission of this testimony were erroneous and constituted improper "other crimes" evidence inadmissible under N.J.R.E. 404(b), <u>State v. Cofield</u>, 127 N.J. 328, 336 (1992), we are satisfied the error was harmless. Evidence defendant held a gun in his hand and turned it over to another was, under these specific facts, utterly innocuous, given the overwhelming evidence defendant was guilty of murder and attempted murder. <u>See, e.g.</u>, <u>State v. Sowell</u>, 213 N.J. 89, 107-08 (2013) (affirming conviction given strength of evidence against defendant despite admission of improper expert testimony).

A-1284-15T4

Defendant argues his sentence is unjustified because the court placed too much weight on aggravating factors three, six and nine, and used "as a basis for all three of them the disturbing circumstances of the offenses for which defendant was convicted." He also complains the court "should have provided a more precise, more detailed statement of reasons" to justify its imposition of a life sentence. Finally, he contends the court did not properly consider the factors in State v. Yarbough, 100 N.J. 627, 643-44 (1985), when it ordered the sentence for attempted murder be served consecutively to the sentence for murder.

The court found the following aggravating factors: three, N.J.S.A. 2C:44-1(a)(3) (the risk the defendant will reoffend); five, N.J.S.A. 2C:44-1(a)(5) (there is a substantial likelihood the defendant was involved in organized criminal activity); six, N.J.S.A. 2C:44-1(a)(6) (the defendant's prior criminal record); and nine, N.J.S.A. 2C:44-1(a)(9) (the need to deter). The court did not find any mitigating factors. See N.J.S.A. 2C:44-1(b)(1) to (13).

Specifically, the court found defendant, who was thirty-three years of age at the time of sentencing, was at risk of reoffending because of his criminal history. According to the pre-sentence report, before committing the

instant offenses, defendant had been adjudicated a delinquent six times and convicted as an adult of third-degree unlawful possession of a weapon. The court found aggravating factor five applied because there was undisputed testimony defendant was not only a member of the Latin Kings, but also the leader of its Trenton "Chapter." The court determined aggravating factor six applied based on defendant's juvenile adjudications and prior criminal conviction. Finally, the court found aggravating factor nine because of the need to deter.

As for imposing a consecutive sentence, the court stated:

> Should the defendant be released on parole, the sentence[] imposed [for attempted murder] is to be served consecutively to the sentence imposed [for murder,] [f]or the mere reason that two lives [were] destroyed, two families [were] destroyed, [and the] destruction is permanent without any hope of repair.

We note that "[a]ppellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). As the Court has reiterated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, although its comments were brief, the court adequately explained its findings regarding the aggravating sentencing factors, and we find no basis to disturb them.

As for the court's imposition of a consecutive sentence, our Supreme Court has made clear that when imposing consecutive sentences, a court must carefully weigh the Yarbough factors. See State v. Miller, 108 N.J. 112, 122 (1987). Those factors are:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time

and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.[4]

[State v. Yarbough, 100 N.J. 643-44 (1985) (footnotes omitted).]

We are satisfied that the record fully supports the court's imposition of

consecutive sentences. Although the court did not expressly articulate its

---

[4] In 1993, the Legislature amended N.J.S.A. 2C:44-5(a) to provide that "[t]here shall be no overall outer limit on the cumulation of consecutive sentences," thereby eliminating guideline number six. L. 1993, c. 223, § 1; see also State v. Eisenman, 153 N.J. 462, 478 (1998) (recognizing supersedence).

reasons for imposing consecutive sentences, they are consistent with the Yarbough factors. Ibid. "There can be no free crimes, and separate crimes ordinarily deserve separate punishment." State v. Johnson, 309 N.J. Super. 237, 271 (App. Div. 1998). Here, the murder and attempted murder were separate and distinct crimes, committed at different times and in different places, and their objectives were predominately independent of each other. Yarbough, 100 N.J. at 643-44.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION