# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0469-16T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KRISLA REZIREKSYON,
a/k/a VENETTE OVILDE,

    Defendant-Appellant.

_____

Submitted February 25, 2019 – Decided May 1, 2019

Before Judges Messano, Gooden Brown, and Rose.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 12-06-1695.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, on the brief).

Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney for respondent (Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

During the afternoon of May 22, 2011, the Irvington Police Department received a 9-1-1 call from defendant, Krisla Rezireksyon Kris, a/k/a Venette Ovilde, who reported that her eight-year-old daughter, C.R.K., was not breathing.[1] When paramedics arrived a few minutes later, they found the child's lifeless body lying on a white sheet in the corner of the living room; she was clad in white clothing and a diaper. One of her legs was wrapped in bandages from its ankle to its thigh, she had no pulse, and rigor mortis had begun to set in.

When police officers and detectives arrived, they saw defendant and co-defendant Myriam Janvier, both clad in white clothing. Defendant told one of the officers she had two other children who were in Elizabeth. Detectives Michael Anthony Davidson and Thomas Sheehan, from the Essex County Prosecutor's Office also responded. Davidson noticed the apartment contained no beds. There were white sheets on the walls and a podium with a Bible next to it. Sheehan collected several pieces of rope, including some tied to radiators.

Davidson discovered a "makeshift door" that was closed, but unlocked, and covered by a white sheet. Upon entering, he discovered defendant's two

---

[1] We use initials to protect the children's identities. R. 1:38-3(c)(9). Additionally, all the children were identified with initials and last name aliases in the indictment. The jury verdict sheet reflects the aliases used during trial.

other children, K.R.K., and S.R.K., seven- and six-years old respectively, in a "weakened state," appearing malnourished and dressed in white. Both were taken to a hospital for medical treatment.

Police took defendant and Janvier to police headquarters, where defendant provided a videotaped statement after officers read her the Miranda rights.[2] Defendant claimed that C.R.K. had injured her leg two days before in a fall in the bathroom. Defendant did not "believe in going to the doctor," and, instead, applied a mixture of corn meal, salt and water to the leg. The leg swelled, and, later, defendant saw that the skin appeared burned, with blisters and sores. She applied more of the mixture and wrapped the leg again. Defendant discovered C.R.K. was non-responsive in the morning of May 22, but prayed for some time before calling 9-1-1.

Defendant said she and Janvier had been living together for approximately six months, and together they belonged to "faith" group, led by Emanuel Rezireksyon. Defendant believed "Christ called [Rezireksyon] as a leader . . . just like Moses and other disciples." Together with Rezireksyon's two daughters, the group would conduct Bible study at his residence or defendant's

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

apartment, but defendant denied being a member of a "cult" or that she was "brainwashed." Davidson testified that he learned Rezireksyon was at defendant's home the night before C.R.K. died.

Defendant told detectives the family followed a strict diet, eating only beans, bread and flour mixed with vegetables. On the weekends they fasted, the children eating only soup. Defendant home schooled the children. She denied ever tying them to the radiators, claiming, instead, that the ropes police found were to warn the children the radiators were hot.

The medical examiner, Dr. Eddy Lilavois, who responded to the scene and later performed an autopsy, testified that C.R.K. was in an "advanced stage of malnutrition." Defendant had informed him while at the apartment that she consulted with others who recommended she apply a mixture of cornmeal and gasoline to the leg, which she did. Dr. Lilavois opined that C.R.K. suffered a fractured femur that had not healed properly, and he observed injuries to the skin on the child's thigh that were "definitely caused by some kind of implement."

Upon removing the wrappings, the doctor saw evidence of caustic burns, which were caused by the gasoline. Dr. Lilavois opined the injuries were between one- and two-weeks old. These chemical burns compromised the skin tissue, permitting bacteria to enter and cause infections. Toxicological test

A-0469-16T4

results confirmed that C.R.K. had sepsis. The doctor opined that the cause of death was "[c]omplications of an unattended, untreated fracture of [the] femur of a severely malnourished child."

Dr. Elizabeth Susan Hodgson, a board-certified pediatrician, testified as an expert in general pediatrics and child abuse pediatrics. She examined K.R.K. and S.R.K. the following day. Both were severely malnourished and their growth was stunted. The doctor observed physical injuries on both. K.R.K. had a fresh fracture of a bone in her hand, and S.R.K. had a healing fracture of his right arm and more recent fractures of his foot. The doctor concluded both children had inadequate diets "over many months," resulting in "nutritional rickets," and life-threatening medical neglect.

An Essex County grand jury indicted defendant and Janvier for the murder of C.R.K, thirty-six other counts alleging crimes involving the maltreatment of all three children, and defendant alone for hindering apprehension. Janvier entered guilty pleas, but defendant elected to go to trial.[3]

---

[3] Janvier pled guilty to first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1); three counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); and three counts of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2). In a separate opinion also filed today, A-5139-16, we affirmed her conviction but remanded the matter to the trial court for resentencing.

At trial, in addition to the above evidence, the State called K.R.K., now eleven-years-old, as a witness. She recalled the "pastor" coming to the apartment, and said he treated the children nicely and brought them treats on one occasion. K.R.K. never recalled leaving the apartment to play outside, visit friends or go to the park. She testified that the children sometimes went days without food.

K.R.K. said that when defendant and "the other lady" left in the morning, they would tie the children's ankles to the radiator and leave a bucket for them to use as a toilet. K.R.K. said both would hit the children with a belt, cord or brush as punishment for not finishing "homework," i.e., religious questions defendant left to answer. She described other punishment and noted that at some point, the children were so weak they lost the ability to walk and had to be "dragged" around "like rag dolls."

Defendant did not testify, but she called her landlord as a witness. He said defendant was initially outgoing and "very personable," but, beginning in 2008, defendant became "reserved," wore white clothing, as did her children, and rarely came to his nearby convenience store. He witnessed a man visiting the apartment for two hours every day, accompanied by women dressed in white.

A-0469-16T4

Defendant also presented the testimony of Dr. Joel E. Morgan, an expert in psychology and forensic neuropsychology. He administered various tests to defendant and opined her IQ was "extremely low," her decision-making was impaired, and she was "easily manipulated." Dr. Morgan concluded that defendant "did not act knowingly in the sense that her strict ideas about that diet, medical care and so forth was a result of her limited ability to really comprehend the potential danger . . . ."[4]

A jury convicted defendant of the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), sixteen counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); and two counts of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7). The jury acquitted defendant of the remaining charges.[5] At sentencing, the judge imposed a twenty-five-year sentence on the aggravated manslaughter conviction, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and two consecutive ten-year sentences for two counts of endangering the welfare of a child, for an aggregate sentence

---

[4] The State called Dr. Azariah Eshkenazi, an expert in forensic psychiatry, to rebut Dr. Morgan's testimony and defendant's diminished capacity defense.

[5] At the conclusion of the State's case, the judge dismissed the charge of conspiracy to commit murder.

A-0469-16T4

of forty-five years imprisonment.  The judge imposed concurrent sentences on the remaining counts.

Before us, defendant raises the following issues:

POINT I

THE COURT'S LIMITATION OF THE EXPERT OPINION OF DR. MORGAN DENIED DEFENDANT A FAIR TRIAL.

POINT II

THE TRIAL COURT ERRED IN REFUSING DEFENDANT'S REQUESTS TO CHARGE ON THIRD[-]PARTY GUILT AND IGNORANCE/MISTAKE.

POINT III

THE DEFENSE MOTION TO DISMISS THE JURY PANEL THAT HAD BEEN SHOWN THE COURT APPOINTED SPECIAL ADVOCATES FOR CHILDREN VIDEO DURING JURY ORIENTATION SHOULD HAVE BEEN GRANTED.

POINT IV

THE TESTIMONY OF DR. HODGSON EXCEEDED THE PROPER SCOPE FOR EXPERT WITNESS AND OPINED ON THE ULTIMATE FACT IN ISSUE.

POINT V

THE DENIAL OF THE DEFENDANT'S MOTIONS FOR MISTRIAL BASED UPON THE TESTIMONY

OF THE STATE'S EXPERT DR. HODGSON WAS
ERROR.

POINT VI

THE AGGREGATE SENTENCE OF [FORTY-FIVE]
YEARS WITH [TWENTY-ONE] YEARS[, THREE]
MONTHS OF PAROLE INELIGIBILITY IMPOSED
UPON DEFENDANT WAS EXCESSIVE AND
SHOULD BE REDUCED. (Not Raised Below)

POINT VII

THE AGGREGATE ERRORS DENIED
DEFENDANT A FAIR TRIAL. (Not Raised Below)

We have considered these arguments in light of the record and applicable legal standards. We affirm.

I.

We address defendant's arguments regarding trial issues before turning to challenges to the jury charge.

A.

In her third point, defendant contends the judge mistakenly exercised his discretion by refusing to dismiss the panel of jurors who saw a video presentation and received written material while in the jury assembly room

9                                                                                    A-0469-16T4

regarding the Court Appointed Special Advocate (CASA) program.[6] The argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We add only the following.

Although defense counsel lodged an objection during jury selection, when scheduling problems arose, the judge dismissed the entire original panel of jurors and began jury selection anew. At that point, with the agreement of counsel, the judge provided prospective jurors with a written questionnaire, including one question asking if any juror recalled the CASA presentation. The record reflects some follow-up questions for two jurors who answered affirmatively, but nothing in the record indicates either the prosecutor or defense counsel raised the issue again.

Defendant's fourth and fifth points contend Dr. Hodgson's testimony exceeded the bounds of proper expert testimony, and the judge erred in denying a mistrial based on that testimony. The issues arose in the following context.

---

[6] CASA volunteers "serve as a resource to the courts in determining the best interests of any child less than [eighteen] years of age who has been removed from his home due to abuse or neglect." N.J.S.A. 2A:4A-92(b). The Court Rules authorize the judge to appoint a CASA volunteer "[i]n any case in which the welfare of a child is in issue . . . who shall act on the court's behalf to undertake certain activities in furtherance of the child's interests . . . ." R. 5:8C.

The judge conducted a pre-trial hearing pursuant to N.J.R.E. 104 regarding the admissibility of Dr. Hodgson's testimony. Defendant objected to the doctor rendering opinions that the children were abused or neglected, arguing those were legal terms, which the judge would ultimately define for the jury, and the doctor's opinion using those terms reached "the ultimate issue" at trial. The transcripts provided on appeal fail to reveal that the judge made a formal ruling on the issue, but it is apparent that he permitted Dr. Hodgson to use those terms during her testimony before the jury, as we already noted.

During her testimony, the prosecutor showed the doctor photographs of the children for her to identify and describe what they depicted. In response to viewing one photograph, Dr. Hodgson said: "Okay. This is a picture of [K.R.K.'s] abdomen, and again, I apologize to the jury and the [c]ourt. These are disturbing photos to look at. I feel disturbed when I look —." Defense counsel objected and moved for a mistrial at sidebar. The prosecutor acknowledged the statement was improper but contended a curative instruction was the proper remedy.

Outside the jury's presence, the judge told the witness not to relate her personal emotions in answering any questions. He then gave the jury the following instructions:

A-0469-16T4

Ladies and gentlemen of the jury, with regard to Dr. Hodgson's comment right before I sent you into the jury room, you are to disregard it. And it is stricken from the record.

Dr. Hodgson's personal feeling or emotional response is irrelevant and improper to communicate to the jury. Inappropriate. Her views and her own emotional responses are not to be considered by you in your deliberations in any manner for any purpose at any time.

Later, the following exchange took place between the prosecutor and Dr.

Hodgson:

Q: Now, Dr. Hodgson, I'm going to direct your attention to [C.R.K.] Did you do a medical record review of [C.R.K.]?

A: I did.

Q: And tell us what a medical record review is.

A: It is, again, looking at as many medical records as we could get a hold of on her from her birth until, I think she last was seen medically by Dr. Jaffrey in 2007. I also had obtained the autopsy report from the medical examiner's office. The medical examiner's office had shared with me copies of the X-rays on [C.R.K.] They had spoken with me. They also shared with me a CD of their photographs of the whole autopsy. I then also reviewed the [Division of Child Protection and Permanency (DCPP)] records and previous referrals that had been made —

[(emphasis added).]

12

Defense counsel objected, arguing references to "previous referrals" from the DCPP, for which there was no evidence at trial, was highly prejudicial. Counsel moved for a mistrial, arguing that no curative instruction could remedy the comments.

The next day, the judge acceded to defense counsel's request to hold a limited N.J.R.E. 104 hearing outside the jury's presence to ascertain whether the doctor had intentionally ignored instructions from the prosecutor to avoid any reference to prior DCPP referrals. Afterwards, defense counsel again moved for a mistrial.

In denying the motion, the judge found: 1) "based on the representations made," there was "absolutely no prosecutorial misconduct in the preparation of . . . Dr. Hodgson to testify"; 2) the doctor had "no intent to suggest to the jury that . . . defendant was ever an object of a previous neglect or abuse investigation or had ever been arrested for child abuse"; 3) Dr. Hodgson's testimony that she did not recall the prosecutor's instruction not to mention the previous referrals was credible; and 4) "one comment by the doctor" did not have "the effect of depriving this defendant of a fair trial." The judge offered to provide a curative instruction, but defendant specifically asked that the judge not give one.

As to the substance of Dr. Hodgson's testimony, defendant reiterates the arguments she made before the trial judge. We find them unpersuasive.

We acknowledge that the offense of endangering the welfare of children makes it a crime for any person with a legal duty for the care of a child to cause the child "harm that would make the child an abused or neglected child as defined in" Title 9. N.J.S.A. 2C:24-4(a)(2). N.J.S.A. 9:6-8.21(c), in turn, defines an "[a]bused or neglected child . . . ."

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.J.R.E. 704. Nevertheless, expert opinion testimony should "avoid use of precise terminology found in the statute[.]" State v. Cain, 224 N.J. 410, 424 (2016) (quoting State v. Nesbitt, 185 N.J. 504, 508 (2006)). "Expert testimony that recites the legal conclusion sought in a verdict is not helpful to the jury." Nesbitt, 185 N.J. at 517.

Here, Dr. Hodgson rendered extensive testimony regarding the children's physical condition upon examination, explaining carefully and extensively why disease processes or metabolic issues did not cause what she observed. She explained why their physical injuries were not consistent with accidents or a child's normal activities. In short, her testimony was more than a simple

parroting of statutory terminology, and it provided information that was well "beyond the ken of an average juror." Cain, 224 N.J. at 420 (quoting State v. Reeds, 197 N.J. 280, 290 (2009)).

Moreover, on cross-examination, Dr. Hodgson explained that she had no knowledge of the criminal statutes or the legal basis for a finding of "abuse and neglect" in New Jersey. The judge's final instructions made clear that the elements of the offense included the specific statutory definition of abuse and neglect. In other words, the jury understood that even though the doctor used those terms, they had especial meaning, which the jury needed to consider in reaching its verdict. We do not think the doctor's use of the terms was "clearly capable of producing an unjust result . . . ." R. 2:10-2.

We also reject defendant's other argument made in Point V. "A mistrial should only be granted 'to prevent an obvious failure of justice[,]'" and the decision to grant a mistrial is "entrusted to the sound discretion of the trial court." State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). "If there is 'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." Ibid. (quoting State v. Allah, 170 N.J. 269, 281 (2002)). "[W]hether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters

15

'peculiarly within the competence of the trial judge.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Winter, 96 N.J. 640, 646–47 (1984)).

Here, the judge demonstrated a careful, thoughtful exercise of his discretion in both instances. The curative instruction after the first statement by the doctor was forceful and immediate. We doubt the jury noticed the fleeting reference to "previous referrals," or that it prejudiced defendant in any meaningful way. Defendant declined the judge's offer to issue another curative instruction. We find no reason to reverse.

Defendant filed notice of her intention to assert a diminished capacity defense, relying on the report of Dr. Morgan. He generally opined that defendant became dependent upon Rezireksyon, who exploited her because of her limited cognitive abilities. Dr. Morgan likened Rezireksyon to cult leaders, describing him as a "pathological narcissist," who was "able to prey" on defendant's characteristics, which left her incapable of opposing "this overpowering individual, who exploited her religious zeal and her naiveté." According to Dr. Morgan, defendant "trusted [Rezireksyon's] judgment above her own and believed that when cooperating with him her daughter would heal and improve." The State urged the judge to limit Dr. Morgan from expressing

A-0469-16T4

any opinion regarding defendant's religious devotion and its relationship, if any, to her alleged diminished capacity.

The judge agreed with the State. In a subsequent written decision, the judge explained that Dr. Morgan's opinion that Rezireksyon was a "pathological narcissist who prey[ed] on vulnerable individuals" was not supported by any facts or data, because the doctor never even spoke with Rezireksyon. The judge noted that the report utilized terms such as "cult," "cult-like" and "brainwashing" without ever defining them. The judge also concluded that Dr. Morgan could not testify that defendant was "easily exploitable" by Rezireksyon because of her intellectual limitations and religious beliefs, since that conclusion was "speculative" and fell outside the "scope of Dr. Morgan's expertise."

However, the judge permitted Dr. Morgan to testify that defendant "suffer[ed] from a mental deficiency that affected her cognitive capacity to form the requisite mental states" based on the tests he administered. In essence, the judge concluded that expert testimony from Dr. Morgan that linked defendant's religious devotion to her diminished capacity was improper.

In Point I, defendant argues the judge erred by limiting the scope of her expert's testimony. We again disagree.

A-0469-16T4

"The Criminal Code authorizes a defendant to present evidence of a mental disease or defect to 'negate the presence of an essential mental element of the crime . . . .'" State v. Baum, 224 N.J. 147, 160 (2016) (quoting State v. Rivera, 205 N.J. 472, 487 (2011)); see also N.J.S.A. 2C:4-2. "This defense 'was designed by the Legislature not as a justification or an excuse, nor as a matter of diminished or partial responsibility, but as a factor bearing on the presence or absence of an essential element of the crime as designated by the Code.'" Baum, 224 N.J. at 160 (quoting State v. Breakiron, 108 N.J. 591, 608 (1987)).

> A defendant may raise a diminished capacity defense if (1) he or she "has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea[,]" and (2) "the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime."
>
> [Id. at 160-61 (alteration in original) (quoting State v. Galloway, 133 N.J. 631, 647 (1993)).]

Nothing in Dr. Morgan's report or in the trial record indicates he had any qualifications, or the factual basis upon which to render an opinion regarding religious beliefs and intellectually impaired individuals. Further, defendant cites no precedent linking religiosity with diminished capacity or that defendant's religiosity was a "mental disease or defect" as that phrase is utilized

A-0469-16T4

in N.J.S.A. 2C:4-2. The court properly limited Dr. Morgan's testimony to his testing, diagnoses, and findings regarding what he believed to be defendant's impaired ability to formulate the requisite intent, i.e., purposeful or knowing conduct that was a prerequisite for a murder conviction. The jury may have indeed accepted the doctor's opinion, having found defendant not guilty of murder.

B.

Defendant asserts the judge's refusal to provide jury instructions on third-party guilt, see Model Jury Charges (Criminal), "Third Party Guilt Jury Charge" (approved March 9, 2015), and mistake, see Model Jury Charges (Criminal), "Ignorance or Mistake (N.J.S.A. 2C:2-4)" (approved May 7, 2007), was reversible error. We again disagree.

We begin by acknowledging, "[a] trial court must charge the jury on an affirmative defense if there is a rational basis in the evidence for the charge." State v. Bass, 224 N.J. 285, 320 (2016) (citing State v. Singleton, 211 N.J. 157, 183 (2012)). "[I]f defense counsel does not request the charge, the court should still give it when the evidence clearly indicates that it is appropriate." State v. Daniels, 224 N.J. 168, 181 (2016) (citing State v. Walker, 203 N.J. 73, 87 (2010)).

The third-party-guilt defense is not an affirmative defense, but rather seeks to raise a reasonable doubt about an essential element of the State's case, identity.  See State v. Cotto, 182 N.J. 316, 332 (2005) (quoting State v. Fortin, 178 N.J. 540, 591 (2004) (noting a defendant's constitutional right to introduce evidence "if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case")).  "[E]ven if there is no evidence linking another specific suspect to the crime, we 'have recognized that evidence that tends to create reasonable doubt that someone else, generically, rather than defendant, committed the offense, is admissible.'" State v. Perry, 225 N.J. 222, 238-39 (2016) (quoting State v. Loftin, 146 N.J. 295, 345 (1996)).

Defendant argued that the evidence supported the charge as to both Janvier and Rezireksyon, noting the children were left alone with Janvier on occasion, and Rezireksyon was in the apartment the night before C.R.K.'s death and exerted influence over both women.  The judge rejected defendant's request, ruling there was "no rational basis that this jury could find . . . the crimes alleged in this indictment could have been committed by anyone other than defendant alone or as an accomplice to . . . Janvier."  The judge gave jury instructions on accomplice liability.

20

With respect to Rezireksyon, the judge reasoned, "there's absolutely no evidence that he committed any of the acts charged, either as a principal, a co-conspirator or accomplice." In her statement, defendant admitted that she was responsible for feeding the children, and the record contained no evidence that Rezireksyon ever assaulted or otherwise harmed the children. We concur with the judge's analysis of the issue.

Mistake of fact is a defense if either: (1) the mistake "negat[es] the culpable mental state required to establish the offense; or (2) [t]he law provides that the state of mind established by such ignorance or mistake constitutes a defense." N.J.S.A. 2C:2-4(a). A mistake of fact is not a true "defense," because it merely amounts to an attack "on the prosecution's ability to prove the requisite mental state of the crime charged." State v. Wickliff, 378 N.J. Super. 328, 334 (App. Div. 2005). In other words, mistake of fact is a "failure of proof" defense. State v. R.T., 411 N.J. Super. 35, 61-62 (App. Div. 2009). The concept of mistake is "technically unnecessary, because '[it] simply confirm[s that n]o person may be convicted of an offense unless each element . . . is proven beyond a reasonable doubt.'" State v. Pena, 178 N.J. 297, 306 (2004) (alterations in original) (quoting State v. Sexton, 160 N.J. 93, 100 (1999)).

Here, defendant submitted a proposed charge advising jurors that defendant mistakenly restricted the children's diet "pursuant to her beliefs," and did not seek medical treatment because she believed "pursuing natural remedies" would make her and the children "more spiritual[.]" The proposed charge told jurors: "If you find that [defendant] honestly but mistakenly held the belief that [sic] she could not have acted knowingly or purposeful [sic], which the State is required to prove beyond a reasonable doubt."

The State objected to the charge, and, although concluding there was sufficient evidence to support providing instructions on mistake, the judge agreed that references to defendant's religious beliefs was inappropriate. As the judge noted, and we agree, a person's religious beliefs cannot serve as a mistake of fact that excuses otherwise criminal conduct. Even if defendant believed not seeking medical care would make the children more "spiritual," such is not the equivalent of defendant believing foregoing medical care would actually prevent physical harm to the children. At the same time, defendant's proposed charge would permit a reasonable juror to conclude that if defendant acted in accordance with her religion, she could not have engaged in criminal conduct.

The judge crafted a different mistake instruction, but defendant objected, arguing the charge was "without proper context" if the religious connotation was

22

omitted. Defense counsel posited that without including defendant's religious beliefs in the charge, it was "not credible to the defense, not helpful to the defense, not rational, and would actually prejudice" defendant. Defense counsel also objected to the charge's application to crimes involving reckless conduct, including aggravated manslaughter and reckless manslaughter.

Ultimately, when defendant again objected to the judge's second proposed charge because it lacked any "religious context," the judge decided not to give any charge and told counsel "the defense is free to argue that the State has not proven the requisite state of mind, with or without the mistake charge." Nevertheless, the judge made a third and final attempt to craft a charge on the issue, which closely tracked the model charge. Both the prosecutor and defense counsel objected, and the judge did not provide any instructions on mistake in his final charge.

Under the circumstances of this case, in particular the judge's conscientious attempts to formulate an appropriate jury charge, we cannot conclude omitting any instructions on mistake was reversible error. First, the final instructions repeatedly reminded the jurors of the State's responsibility to prove each element of the offenses charged, including the requisite mental states. Second, defense counsel argued in summation that defendant

"mistakenly" listened to others when she decided to apply a "natural treatment" to C.R.K.'s leg, and this demonstrated defendant was "trying to heal" her daughter. Counsel further argued defendant's dietary restrictions were borne of a "mistaken[] belie[f] that it would lead to a pure, spiritual life." We consider whether the judge's omission of any charge on mistake requires reversal "in light of the arguments made by trial counsel, as those arguments can mitigate prejudice resulting from a less-than-perfect charge." State v. Robinson, 165 N.J. 32, 47 (2000) (citing State v. Morton, 155 N.J. 383, 423 (1998)). Lastly, we note that the jury acquitted defendant of purposeful and knowing murder, the major charge to which defendant sought the instruction.

In light of the foregoing discussion, we obviously reject defendant's contention in Point VII that cumulative errors require reversal. See State v. Orecchio, 16 N.J. 125, 129 (1954) (holding that, where "legal errors . . . in their aggregate have rendered the trial unfair, . . . fundamental constitutional concepts dictate the granting of new trial before an impartial jury"). We affirm defendant's conviction.

II.

In sentencing defendant, the judge found aggravating factors one, two, three and nine. See N.J.S.A. 2C:44-1(a)(1) ("nature and circumstances of the

offense, . . . including whether . . . it was committed in an especially heinous, cruel, or depraved manner"); (a)(2) ("gravity and seriousness of harm inflicted . . . , including whether . . . defendant knew . . . the victim . . . was particularly vulnerable or incapable of resistance due to . . . extreme youth . . . ."); (a)(3) (the risk of re-offense); and (a)(9) (the need to deter defendant and others). The judge also found mitigating factor seven. See N.J.S.A. 2C:44-1(b)(7) (no prior criminal history). Defendant contends the judge erroneously found certain aggravating factors, failed to find other mitigating factors and improperly imposed consecutive sentences.

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). As the Court has reiterated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Furthermore, "trial judges have discretion to decide if sentences should run concurrently or consecutively." Miller, 205 N.J. at 128. See N.J.S.A. 2C:44-

25

5(a). "When a sentencing court properly evaluates the Yarbough factors[7] in light of the record, the court's decision will not normally be disturbed on appeal." Id. at 129.

---

[7] The Yarbough factors are:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominantly independent of each other;
> >
> > (b) the crimes involved separate acts of violence or threats of violence;
> >
> > (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
> >
> > (d) any of the crimes involved multiple victims;
> >
> > (e) the convictions for which the sentences are to be imposed are numerous;

26

Defendant argues the judge relied on post-mortem evidence — cockroach bites the medical examiner found on C.R.K.'s body — to support his conclusion that her conduct was "especially heinous, cruel, or depraved." N.J.S.A. 2C:44-1(a)(1). In State v. McGuire, 419 N.J. Super. 88, 158-60 (App. Div. 2011), we held that the trial court did not abuse its discretion when considering the depraved conduct of the defendant following the murder, because the sentencing court viewed the defendant's actions "as a continuous episode of purposeful, depraved, and cruel conduct." So, too, is defendant's conduct in this case. However, even if the judge's reliance on this fact was mistaken, he listed several other facts that support the finding of aggravating factor one.

> (4) there should be no double counting of aggravating factors;
>
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]
>
> [State v. Yarbough, 100 N.J. 627, 643-44 (1985), cert. denied, 475 U.S. 1014(1986).]

A sixth factor, imposing an overall outer limit on consecutive sentences, was superseded by legislative action. See State v. Eisenman, 153 N.J. 462, 478 (1998).

A-0469-16T4

Defendant claims the judge erred in finding aggravating factor two, claiming the age of the children was an element of endangering their welfare, and, thus, the judge engaged in double counting. "[A] sentencing court must scrupulously avoid 'double-counting' facts that establish the elements of the relevant offense." Fuentes, 217 N.J. at 74–75 (citing Yarbough, 100 N.J. at 645). However, cognizant of the argument defendant now raises, the judge essentially stated he was finding aggravating factor two specifically as to the aggravated assault charges.

Defendant argues the judge erred in finding aggravating factor three because she lacked a criminal record, and the judge based this finding upon defendant's refusal to accept responsibility for C.R.K.'s death and the injuries inflicted on the other children. Despite defendant's suggestion that her lack of a previous record undermines the court's decision to apply the third aggravating factor, that factor "can be based on assessment of a defendant beyond the mere fact of a prior conviction, or even in the absence of a criminal conviction." State v. Thomas, 188 N.J. 137, 154 (2006). In State v. Carey, the Court reversed this court and specifically found that a defendant's failure to accept responsibility for the crime "does provide support for the trial court's conclusion" as to factor three. 168 N.J. 413, 427 (2001). Moreover, the judge here specifically accorded

less weight to factor three than the other aggravating factors. Defendant's argument as to factor nine requires no comment. R. 2:11-3(e)(2).

Defendant contends the judge should have found mitigating factors two, four and eight. See N.J.S.A. 2C:44-1(b)(2) ("defendant did not contemplate that [her] conduct would cause or threaten serious harm"); (b)(4) ("substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense"); and (b)(8) ("defendant's conduct was the result of circumstances unlikely to recur"). However, the judge considered factors two and four, including Dr. Morgan's report and testimony, and rejected their application. He also considered factor eight, and, although recognizing defendant's parental rights were terminated in a separate action, the judge concluded defendant might someday be in a position to have other children in her care. We see no reason to disturb the judge's discretionary decisions.

Defendant recognizes that the judge imposed consecutive sentences upon the aggravated manslaughter, and two other counts — one for each of the remaining two children — but argues this was an abuse of discretion because "the offenses were interrelated, occurred within the same time and place and was [sic] clearly one period of aberrant behavior." However, the record reveals the judge addressed that argument, carefully considered the Yarbough factors, and

concluded that three consecutive sentences were appropriate: one for the aggravated manslaughter of C.R.K., one for malnourishment of S.R.K., and one for a physical assault of K.R.K.

We find no mistaken exercise of the judge's discretion in this regard.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0469-16T4