**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0876-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TYHAN BROWN,
a/k/a TYHAM BROWN,

     Defendant-Appellant.

_____

Submitted September 20, 2021 – Decided October 8, 2021

Before Judges Messano and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-12-3622.

Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Kevin J. Hein and Rachel M. Lamb, Special Deputy Attorneys General/Acting Assistant Prosecutors, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Tyhan Brown, a/k/a Tyham Brown, of first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3(a)(1)(2); first-degree attempted murder of Amir Dixon, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1); the lesser-included charge of first-degree aggravated manslaughter of Gabrielle Hill-Carter, N.J.S.A. 2C:11-4(a)(1); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b).[1]  After appropriate mergers, the judge sentenced defendant to a sixteen-year term of imprisonment on the attempted murder conviction, subject to an eighty-five-percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; a consecutive twenty-eight-year term of imprisonment subject to NERA on the aggravated manslaughter conviction; and a consecutive seven-year term of imprisonment on the unlawful possession of a weapon conviction, subject to forty-two months of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c).

Defendant raises the following points for our consideration:

---

[1] Defendant was indicted with two codefendants, his mother, Shakia Land, and defendant's girlfriend at the time, Natasha L. Gerald, who were each charged with one count of hindering the apprehension of defendant, N.J.S.A. 2C:29-3(a)(7).  The court entered pre-trial orders severing those counts of the indictment, and defendant was tried separately.

POINT I — DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE ERRONEOUS ADMISSION OF MULTIPLE INADMISSIBLE HEARSAY STATEMENTS. (Not Raised Below).

POINT II — THE TRIAL COURT COMMITTED ERROR IN PERMITTING EVIDENCE OF PRIOR CRIMINAL ACTIVITY AND/OR DISPOSITION UNDER N.J.R.E. 404(b): THE TRIAL COURT ERRED IN ALLOWING EVIDENCE OF DEFENDANT'S PURPORTED GANG AFFILIATION.[2]

POINT III — THE TRIAL COURT SHOULD HAVE SUA SPONTE DISMISSED ALL THE COUNTS IN THE INDICTMENT UNDER STATE V. REYES DESPITE THE DEFENDANT'S COUNSEL'S FAILURE TO MAKE SUCH A MOTION AT THE CONCLUSION OF THE STATE'S CASE. (Not Raised Below).

POINT IV — THE TRIAL COURT SHOULD HAVE SUA SPONTE ENTERED A JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT BASED UPON THE INSUFFICIENCY OF THE EVIDENCE. (Not Raised Below).

POINT V — THE SENTENCE TO THREE CONSECUTIVE TERMS TOTALING AN AGGREGATE TERM OF FIFTY-ONE YEARS, FORTY YEARS AND TEN MONTHS PAROLE INELIGIBILITY WAS EXCESSIVE.

---

[2] We have eliminated this point's subpoints.

Having considered these arguments in light of the record and applicable legal standards, we affirm defendant's convictions but remand to the Law Division for resentencing.

I.

A.

The State moved pre-trial to admit certain evidence, specifically: uncharged prior bad acts of defendant, pursuant to N.J.R.E. 404(b); and, a certain Facebook Live video depicting defendant badmouthing Dixon days before the shooting.[3] The judge conducted an evidentiary hearing at which Camden County Prosecutor's Office Detective Sherman Lee Hopkins, the lead homicide investigator, was the sole witness.

The State contended that on August 24, 2016, just before 8:30 p.m., police responded to an address in Camden and found eight-year-old Gabrielle "Gabby" Hill-Carter with a gunshot wound to her head. She died two days later. The

---

[3] The Rule 104 hearing also addressed other evidence the State sought to admit at trial. Defendant was arrested in Tennessee for a violation of his juvenile parole, and he provided Detective Hopkins and his colleague with a recorded video statement on August 30, 2016, after waiving his Miranda rights. See Miranda v. Arizona, 384 U.S. 436 (1966). Additionally, the detective obtained a warrant and secured recordings of phone calls defendant made to codefendant Gerald from the Camden County jail. The judge ruled the evidence was admissible. Since defendant's brief does not challenge the admission of this evidence at trial, we deem any issue in that regard to have been waived. State v. W.C., ___ N.J. Super. ___, ___ (App. Div. 2021).

child, however, was not the intended target of the shooting; instead, the State asserted the target was Amir "Savage" Dixon, someone with whom defendant was having an ongoing gang-related dispute documented on social media.

At the pretrial hearing, Hopkins identified video from a surveillance camera near the homicide scene that showed Dixon, Gabby, and others on the sidewalk immediately before the shooting. The detective also identified a Facebook Live video recording of defendant made on August 20, 2016. In explicit language that contained gang references, defendant blamed Dixon for "call[ing] the cops on us."

Hopkins testified about conversations he had with others during the investigation, including Dixon's friend, Michael Jones. Jones relayed specific details of a prior gang-related incident on August 19 or 20, 2016. According to Jones, defendant and others were on four-wheel all-terrain vehicles (ATVs) when they confronted Dixon on the street; defendant brandished a weapon at Dixon.

Detective Hopkins also spoke with John Burgos, a friend of defendant. Burgos said he picked defendant up after the shooting on August 24, and that defendant was in possession of either a .380- or 9-mm. handgun. Burgos said defendant told him about an incident earlier in the day, in which Dixon slapped defendant and shot at him. Burgos also told the detective that defendant said he

and others had "jumped out" at Dixon later that evening. Defendant fired at Dixon, but his weapon jammed, and he did not hit anyone.

After considering oral argument, and citing State v. Cofield, 127 N.J. 328 (1992), and State v. Goodman, 415 N.J. Super. 210 (App. Div. 2010), the judge concluded evidence of the ATV incident and the Facebook Live video were admissible.

## B.

At trial, the State introduced the surveillance video and the testimony of several witnesses who were present at the shooting and its immediate aftermath. The witnesses described, and the video showed, Gabby playing on her bike with other children in the area in front of her home. One of the witnesses said that in the weeks prior to the shooting, there were some "new guys" hanging around the neighborhood and an increase in drug activity. Dixon was one of the "new guys." Another witness, Ida Bush, who lived across the street from Gabby's house, saw Dixon follow a couple to a nearby street corner shortly before the shooting started, presumably to sell them drugs. The woman who intended to purchase the drugs was called as a State's witnesses.

Dixon testified that as he walked toward the street corner, he saw an individual approaching and heard gunshots. He ran past Gabby and into Ms. Bush's house; Dixon closed the door, leaving the child outside on the steps as

6

the shooting continued. When it stopped, Ms. Bush heard someone cry, "the baby, the baby." She opened her front door, and Gabby's body fell into the doorway. None of the witnesses, including Dixon and his friend, Ralph Johnson, who was with Dixon before the firing started, identified defendant as being at the scene.

The Facebook Live video was played for the jury. It suffices to say that in explicit language, defendant blamed "Savage" for calling police after the ATV incident a few days earlier. Additionally, as noted, Detective Hopkins obtained copies of a recorded phone call between defendant and Gerald from the Camden County jail. Defendant instructed Gerald to open a Facebook Live stream while he was on the phone and said he would not start talking until at least six people were watching live. During the call, defendant criticized Burgos for speaking with the police, stating "tell the gang to stay away from John Burgos, he different." Defendant called Burgos a "rat" for giving "two 100-page statements." Defendant said about Burgos, "[h]e think that we cool, we really not cool. . . . He got two statements. . . . Who made him to say my name? What made him say my name?"

Police also recovered a Facebook message defendant posted on his public access page at 8:14 p.m. on August 26, 2016, the night Gabby died. It said:

> This beef shit, I give it up. The street shit[,] I give it up. It's the same shit every[]day. . . . Shit ain't

7

doing nothing but breaking my little family apart. I'm tired of keeping my mom up all times of the night worried about me, stressing her out. I got [five] sisters and a child to look after. Y'all can have that shit. Word up. Y'all can call me what y'all want . . . . The shit y'all trying to do now[,] I been did that shit man[,] word up. So when it comes to the street shit, do me a favor and count me out. I just want my mom and my sisters and my whole support system to know I'm sorry and I got this. Trying to save my momma a tear. Got to bury her, can't let her bury me, [it] ain't gonna happen . . . .

In the statement provided to Detective Hopkins while in custody in Tennessee, defendant claimed that he was not at the scene of the shooting. Rather, earlier in the day, his aunt, Shante Land, drove defendant and his family to her home in Sicklerville. According to defendant, his mother was fearful because gunshots were fired at her car earlier in the day, leaving a bullet hole in the window.

The State called a police officer who responded to defendant's mother's call that her car was hit by gunfire earlier in the day of Gabby's shooting. He confirmed that the car was struck by gunfire. Ms. Land, however, testified that although she drove defendant and his family to Sicklerville, they did not arrive until 11 p.m., well after the shooting. This was confirmed by a Gloucester City police officer who testified that he stopped the vehicle for running a red light around 10 p.m.

8

FBI Special Agent William Schute testified that forensic analysis of defendant's cell phone records revealed the phone was in Camden in "close proximity" to the murder scene at 8:11 p.m., 8:18 p.m., and 8:31 p.m. The State's ballistics experts testified that at least four different firearms were discharged at the scene of the shooting. Three different handguns discharged the shells and casings recovered from different locations around the scene; however, none of the recovered casings could be linked to the bullet that killed Gabby, because that had been fired by a revolver.

C.

Additionally, the State called Jones, Burgos and Emmett Tolbert, defendant's cellmate while he was detained in Tennessee, as witnesses at trial. We set forth their testimony separately, because that evidence, the prosecutor's direct examination, and the court's rulings, are the subjects of Point I in defendant's brief.

Tolbert testified that he and defendant were gang members. Defendant was distressed when he returned to the cell they shared after being interrogated by New Jersey detectives. Defendant told Tolbert that he had shot a rival gang member in the head with a revolver while the man was running into his house and that seven people were involved in the shooting. Defendant did not believe he would be charged because there were so many others involved. Defendant

9

also complained to Tolbert that police were "harassing" his family members and girlfriend, and he hoped that his girlfriend "sticks to the script." During direct examination, the prosecutor showed Tolbert his statement on several occasions, asking if it refreshed his recollection, even though, on some occasions, the witness had not indicated any lack of memory.

Burgos was called as a State's witness and immediately claimed no knowledge or recollection of any statement he gave to Detective Hopkins. In her questions, the prosecutor frequently included facts Burgos allegedly told the detective in his statement and asked if he recalled those facts or that he told them to Hopkins. Burgos continued to claim ignorance or lack of recollection.

There were no objections to any of the direct examination until defense counsel requested a sidebar and told the judge: "[T]he witness said I don't remember [thirty] times, [forty] times. I think it's appropriate to do a Gross[4] hearing and a video." The prosecutor objected, stating she was "almost done" and counsel should have the opportunity to cross-examine Burgos before the hearing. The judge agreed, and the prosecutor's questioning continued, frequently including facts Burgos told the detective and asking if the witness recalled. Burgos said he did not recall in answering nearly every question.

---

[4] State v. Gross, 121 N.J. 1 (1990).

A-0876-18

When the prosecutor ended direct examination, defense counsel again asked for a sidebar. He advised the judge that he wanted the video recording of Burgos's statement played for the jury before he cross-examined the witness. The judge asked counsel: "[Y]ou have no objection to it being played in lieu of a Gross hearing being conducted?" Counsel responded: "That's indeed correct . . . ." The prosecutor then played the video recording for the jury, and defense counsel later cross-examined Burgos.

Burgos told police that on the night of August 24, 2016, he picked up defendant in North Camden where he was standing outside of a van with five other individuals who were "showing off" guns; defendant also had a gun. Defendant told Burgos that earlier in the day, Dixon had slapped him during an argument and fired a shot at him. Defendant saw Dixon later in the evening, and he "jumped out" at Dixon, who ran away. Defendant claimed his gun jammed when he tried to fire. Burgos told Hopkins that after the shooting, defendant's mother sent defendant to live with a relative in Tennessee to "keep him out of trouble."

When Jones testified, he claimed not to recall critical details regarding the ATV incident, in some instances denying things he told Detective Hopkins in his statement. The prosecutor ceased her questioning and outside the presence of the jury, asked the judge to conduct a Gross hearing. Hopkins then testified

11

about the circumstances under which he took Jones' recorded video statement, which was played for the judge. The judge considered the factors outlined by the Court in Gross.[5] He determined Jones "feigned failure of recollection," and the State had proven the "reliability of [the] statement." It was played for the jury with redactions.

In the statement, Jones said there was "beef" between defendant, who was a member of the Bloods, and Dixon who was a Hoover Crip. A few days before Gabby's shooting, three men atop ATVs pulled up to Jones and Dixon on the street, started "some bully shit," and flashed a gun at Dixon. Jones said defendant came back and "hit[] a little girl" because he thought Dixon called police regarding the ATV incident. On cross-examination, Jones said his statement was all "hearsay and lies," and that he never saw defendant with a gun.

Defendant did not testify or call any witnesses.

## II.

In Point I, defendant contends he was denied a fair trial because of the "admission of multiple inadmissible hearsay statements" during the testimony of Jones, Burgos and Tolbert. Defendant claims this occurred through the prosecutor's use of the prior statements those witnesses made to law enforcement. Defendant acknowledges there was never any objection from

---

[5] Id. at 10 (quoting State v. Gross, 216 N.J. Super. 98, 109–10 (1990)).

defense counsel, and so we review the argument employing the plain error standard. See R. 2:10-2 (An "appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial . . . court" if "it is of such a nature as to have been clearly capable of producing an unjust result.").

"We review the trial court's evidentiary ruling 'under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Williamson, 246 N.J. 185, 198–99 (2021) (quoting State v. Prall, 231 N.J. 567, 580 (2018)). N.J.R.E. 803(a)(1)(A) provides that prior inconsistent statements may be admitted as substantive evidence if they are inconsistent with a witness' testimony and, if offered by the party calling the witness, they are sound-recorded or in a writing made or signed by the witness.

We have held that a prior statement may be inconsistent, for purposes of this Rule, when "it deviate[s] from [the witness'] assertions on the witness stand," or when the witness "feigned a lack of recollection regarding the facts contained in his prior statement." State v. Caraballo, 330 N.J. Super. 545, 556 (App. Div. 2000). See State v. Brown, 138 N.J. 481, 542 (1994) ("[A] feigned lack of recollection is an inconsistency on which the admission of a witness's prior inconsistent statement may be based."). "The Gross hearing — the name given to the 104 hearing — requires the trial court to determine the admissibility

13                                                                A-0876-18

of an inconsistent out-of-court statement by assessing whether the statement is reliable." State v. Cabbell, 207 N.J. 311, 322–23 n.5 (2011) (citing Gross, 121 N.J. at 10, 17). The burden is on the party seeking to admit the statement to prove the reliability of the prior inconsistent statement by a fair preponderance of the evidence invoking "all surrounding circumstances." State v. Spruell, 121 N.J. 32, 42 (1990) (citing Gross, 121 N.J. at 16–17).

We agree with defendant that the process employed by the prosecutor with respect to Jones and Burgos was not textbook. Frequently, the prosecutor posed questions to the witnesses that included the very facts contained in the subsequently admitted statements and asked if the witness made that statement or recalled making the statement. That was improper, because the judge had not yet ruled on the admissibility of the prior statements under N.J.R.E. 803(a)(1)(A). When posed, the questions contained inadmissible hearsay.

However, there was no objection to the direct examination. Moreover, in Jones' case, we agree with the judge's penultimate ruling, i.e., that Jones was feigning ignorance and, therefore, the State established inconsistency for purposes of the evidence rule. In addition, in Jones' case, the judge considered the Gross factors and concluded the statement was reliable. Since we agree with the judge's conclusion that the prior statements were admissible subject to

14

redaction, any error in the prosecutor's direct examination was harmless beyond a reasonable doubt.[6]

As to Burgos, not only was there no objection to the prosecutor's questions on direct examination, but defense counsel also interrupted and requested a sidebar, noting the witness' repeated lack of recollection to simple questions posed. He then asked the judge to hold a Gross hearing, and, after the prosecutor asked some additional questions without objection, defense counsel requested the judge permit Burgos' statement to be played for the jury before he conducted cross-examination. Any objection now raised to the admission of the statement lacks sufficient merit to warrant discussion under the invited error doctrine. R. 2:11-3(e)(2). See State v. A.R., 213 N.J. 542, 561 (2013) (holding "trial errors that were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal" (quoting State v. Corsaro, 107 N.J. 339, 345 (1987))). The invited admission of Burgos' statement into evidence makes any error in the prosecutor's method of establishing its inconsistency harmless beyond a reasonable doubt.

---

[6] Defendant now raises for the first time that Jones' statement included inadmissible hearsay, in particular, a statement Jones said Ralph Johnson made implying that defendant had shot at Dixon and Johnson. The State contends that the statement was independently admissible as an "excited utterance," pursuant to N.J.R.E. 803(c)(2). We need not decide the issue because Johnson's alleged statement was fleeting in the context of Jones' entire statement, was confusing as to whom it accused of the shooting, and its admission was not plain error.

15

Lastly, as to Tolbert's testimony, defendant claims the prosecutor impermissibly used his prior statement in a manner that permitted the witness to simply "parrot" his prior statement. We disagree.

"Once a proper foundation has been laid, a witness may examine any document to refresh his memory." State v. Carter, 91 N.J. 86, 122 (1982). "The admissible evidence is the recollection of the witness, and not the extrinsic paper." Id. at 123. "In propounding questions, a prosecutor may not merely parrot a statement ostensibly used to refresh recollection." Caraballo, 330 N.J. Super. at 558. In this case, the prosecutor did use Tolbert's prior statement to refresh his recollection after the witness said he could not recall what he had previously stated. Tolbert then testified generally consistently with his statement, and there was never an objection to that testimony. The method employed by the prosecutor does not compel reversal.

III.

In Point II, defendant contends that the judge erred in ruling evidence of the prior ATV incident and defendant's Facebook Live posting were admissible. According to defendant, the prior bad act evidence failed to meet the Cofield standard for admission, and the video, with its gang-related rhetoric, violated the limitations we set forth in Goodman. Again, we disagree.

16

"[S]ensitive admissibility rulings regarding other-crimes evidence made pursuant to Rule 404(b) are reversed '[o]nly where there is a clear error of judgment.'" State v. Green, 236 N.J. 71, 81 (2018) (second alteration in original) (quoting State v. Rose, 206 N.J. 141, 157–58 (2011)). While evidence of uncharged crimes or bad acts may be admissible to prove, among other things, motive, such "evidence . . . 'has a unique tendency' to prejudice the jury . . . [and] under Rule 404(b) 'must pass [a] rigorous test.'" Ibid. (second alteration in original) (first quoting State v. Reddish, 181 N.J. 553, 608 (2004), then quoting State v. Garrison, 228 N.J. 182, 194 (2017)).

While membership in a gang is not inherently criminal, evidence that a defendant is affiliated with a gang would tend to lead the average juror to conclude that the defendant has engaged in criminal activity. Goodman, 415 N.J. Super at 227–28. "Such evidence has the potential to 'taint' a defendant in much the same way as evidence of actual criminal conduct. Consequently, the evidence can only be used if the more demanding provisions of N.J.R.E. 404(b), as interpreted in Cofield, are satisfied." Id. at 228. The test for admission is well-known:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;

17

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Goodman, 415 N.J. Super. at 229–30 (quoting State v. Williams, 190 N.J. 114, 122 (2007)); See also Cofield, 127 N.J. at 338.]

The trial judge evaluated the interrelated evidence of the prior ATV incident and the Facebook Live video by employing this four-prong analysis. Defendant's arguments that the evidence of his affiliation with a rival gang and prior recent incidents between the two men did not establish motive, or that the evidence, which came in large part from defendant's own mouth, was less than clear and convincing, or that its potential prejudice outweighed its probative value, lack sufficient merit to warrant extended discussion. R. 2:11-3(e)(2).

IV.

In Points III and IV, defendant contends that the judge should have sua sponte dismissed the indictment at the end of the State's case pursuant to State v. Reyes, 50 N.J. 454 (1967), or sua sponte entered judgment notwithstanding the verdict based on the insufficiency of the evidence. In large part, defendant contends the evidence was insufficient to support conviction of conspiracy to commit murder. He then asserts in conclusory fashion, "[t]he same argument

18

with regard to conspiracy is hereby made with regard to the remaining counts in the indictment." Defense counsel failed to make either motion at or after trial.

Initially, we refuse to consider the argument as it relates to any conviction other than conspiracy. See Nextel of N.Y., Inc. v. Borough of Englewood Cliffs Bd. of Adjustment, 361 N.J. Super. 22, 45 (App. Div. 2003) ("Where an issue is based on mere conclusory statements by the brief writer, we will not consider it." (citing Miller v. Reis, 189 N.J. Super. 437, 441 (App. Div. 1983))). N.J.S.A. 2C:5-2(a), provides in pertinent part:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
>
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

"Because the conduct and words of co-conspirators is generally shrouded in 'silence, furtiveness and secrecy,' the conspiracy may be proven circumstantially." State v. Samuels, 189 N.J. 236, 246 (2007) (quoting State v. Phelps, 96 N.J. 500, 509 (1984)).

Here, there was significant direct and circumstantial evidence that defendant was part of a conspiracy to kill Dixon. There was evidence of rising tensions between two rival gangs in the days before the shooting. In the Facebook Live video, defendant urged his cohorts to "gang back there" because he believed Dixon had called police after the ATV incident. Finally, there was significant forensic evidence that numerous rounds fired at the scene came from at least four different weapons discharged at various locations around the intersection where Dixon was dealing drugs. We affirm the conviction for conspiracy to commit murder.

V.

Defendant was twenty years old at the time of sentencing, and, although this was his first adult conviction, the judge noted his record of juvenile adjudications and violations of probation was essentially unbroken during the previous five years. The judge concluded that aggravating factors three, five, six and nine applied. See N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense); (5) (involvement in "organized criminal activity"); (6) (prior criminal record); (9) (need to deter defendant and others). He rejected all mitigating factors proposed by defense counsel.

In concluding consecutive sentences were appropriate, the judge cited reliance on the factors outlined in State v. Yarbough, 100 N.J. 627, 643–44

20

(1985).[7]   He noted there were two separate victims of defendant's crimes and concluded the primary tenet justifying consecutive sentences was "that there be

---

[7] The Yarbough factors are:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous;
>
> (4) there should be no double counting of aggravating factors;

21

no free crimes in a system for which punishment shall fit the crime." In imposing a consecutive sentence for the unlawful possession of a firearm, the judge reiterated this principle, and then said: "There's simply too many guns in the city of Camden. There's too many people running around thinking that that somehow makes them more important, bigger[,] and allows them to wreck harm on other people[,] and we simply can't allow that to happen." The judge imposed the sentences referenced earlier.

Defendant argues the aggregate sentence imposed was excessive because the judge failed to properly weigh the aggravating and mitigating sentencing factors and should have imposed concurrent instead of consecutive sentences.

We begin by noting "[a]ppellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). As the Court has repeatedly reiterated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the
>
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]
>
> [100 N.J. at 643–44.]

A sixth factor, imposing an overall outer limit on consecutive sentences, was superseded by legislative action. See State v. Eisenman, 153 N.J. 462, 478 (1998) (citing N.J.S.A. 2C:44-5(a)).

sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)).]

Furthermore, "trial judges have discretion to decide if sentences should run concurrently or consecutively." Miller, 205 N.J. at 128. See N.J.S.A. 2C:44-5(a). "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." Id. at 129.

Initially, we agree with the State that the judge's findings regarding the aggravating factors, and his denial of the proposed mitigating factors, were fully supported by the record. We reject defendant's argument to the contrary.

However, since the sentencing and since the appellate briefs were filed, the Court decided State v. Torres, 246 N.J. 246 (2021). In that case, the Court exhaustively reviewed the Yarbough factors, while reaffirming the discretionary authority of trial courts to impose consecutive sentences by using those guidelines. Id. at 264–66.

The Court recognized, however, that sentencing judges "often seized upon" the "'no free crimes'" factor identified in Yarbough, but that since

23                                                    A-0876-18

Yarbough was decided, the Legislature had eliminated the sixth factor which limited the overall length of consecutive sentences. Id. at 269. The Court explained that the Yarbough "no free crimes" factor was part of "a set of considerations that originally included an outer limit." Ibid. As a result, the Court held:

> An explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings, is essential to a proper Yarbough sentencing assessment. . . . Acknowledging and explaining the fairness of the overall sentence imposed on the defendant advances critical sentencing policies of the Code, as amplified by Yarbough. It remains, in fact, the critical remnant of accountability imposed by Yarbough, since the legislative elimination of the outer limit imposed by factor six.
>
> [Id. at 268.]

In this case, the judge noted his reliance on the Yarbough factors, although he repeatedly cited only the "no free crimes" factor without discussing any others. He did not address, explicitly or implicitly, the overall fairness of the fifty-one-year term of imprisonment with nearly forty-two years of parole ineligibility imposed on a twenty-year-old defendant after his first adult conviction.

Make no mistake about it. These crimes were senseless and heinous, resulting most notably in the death of an innocent eight-year-old child.

24

Defendant deserves the full measure of punishment the Criminal Code permits through the reasoned exercise of judicial discretion.  As the Court has now made clear in <u>Torres</u>, critically, that includes the court's consideration of the overall fairness of the sentence and an explicit statement to that effect.

We therefore vacate the sentence imposed and remand the matter for resentencing.  We express no position on the appropriate aggregate sentence.  In all other respects, we affirm defendant's convictions.

Affirmed, and remanded for resentencing.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0876-18